IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ONE WISCONSIN INSTITUTE, INC.,
et al.,

       Plaintiffs,

      v.                                          Case No. 15-CV-324

MARK L. THOMSEN, et al.,

       Defendants.

---

JUSTIN LUFT, et al.,

       Plaintiffs,

      v.                                          Case No. 20-CV-768

TONY EVERS, et al.,

       Defendants.

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON REMAND FROM THE SEVENTH CIRCUIT COURT OF APPEALS

---

The I.D. Petition Process ("IDPP") automatically issues a voting-compliant ID to anyone who goes to the DMV, gets a picture taken, and fills out short forms. It does not matter what documents the applicants bring or whether they submit a complete application—they will get a voting compliant ID.

The process has adapted in recent years to solve problems that DMV, and this Court, has previously identified. While the basic applicant experience (getting an ID in the mail after filing out the application) has not changed, many of the "back office" procedures have improved to be more efficient and exhaustive than ever before. Additionally, public education about the IDPP has been integrated into statewide election outreach across multiple channels, making voters aware of the simple process for getting an ID.

Here, Plaintiffs challenge the IDPP as an undue burden on voting. The Seventh Circuit has rejected that broad claim as well as facial challenges to the IDPP and concluded, in multiple decisions, that the IDPP as a process is adequate to ensure that any eligible voter can get a voting-qualifying ID.[1]

The sole question on remand is whether the process is reliable such that individual voters can get a voting-compliant ID with reasonable effort. The answer to this question is "yes" because anyone can get an eligible ID by gathering what documents they have and going to the DMV to fill out an application and pose for a picture. This "surely does not qualify as a substantial burden on the right to vote." *Crawford v. Marion Cty. Election Bd.*,

---

[1] *See Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020) ("*Frank III* says that the state's process, *as the state describes it*, is adequate"); *Frank v. Walker*, 835 F.3d 649, 651 (7th Cir. 2016) (denying initial *en banc* review because "Wisconsin has enacted a rule that requires the Division of Motor Vehicles ('DMV') to mail *automatically* a free photo ID to anyone who comes to DMV one time and initiates the free ID process.").

553 U.S. 181, 198 (2008). Plaintiffs have no meritorious claims remaining, and these cases should be dismissed.

## BACKGROUND

### I.   Plaintiffs' broad challenges to the IDPP have been resolved, leaving only a narrow inquiry on remand: is the IDPP being implemented reliably?

Plaintiffs' claims in these cases are that the IDPP imposes an unlawful burden on voting. (OWI Dkt.[2] 141:63–64 (Second Amended Complaint).) (Luft Dkt.[3] 31:39–48.) Prior litigation has largely resolved those claims. The Seventh Circuit has approved the IDPP as a process and remanded on the narrow issue of how the process is being implemented as to individual voters.

Though the full background of this case spans six district court decisions,[4] nine Seventh Circuit decisions,[5] and two U.S. Supreme Court

---

[2] "OWI Dkt." refers to docket entries in Western District of Wisconsin case number 15-CV-324.

[3] "Luft Dkt." refers to docket entries in Western District of Wisconsin case number 20-CV-768.

[4] *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014); *Frank v. Walker*, 141 F. Supp. 3d 932 (E.D. Wis. 2015); *One Wisconsin Inst., Inc. v. Thomsen*, No. 15-CV-324-JDP (W.D. Wis. Aug. 11, 2016); *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Frank v. Walker*, No. 11-C-1128 (E.D. Wis. July 29, 2016); *One Wisconsin Inst., Inc. v. Thomsen*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019).

[5] *Frank v. Walker*, 766 F.3d 755 7th Cir. 2014); *Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014); *Frank v. Walker*, 773 F.3d 783 (7th Cir. 2014); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016); *Frank v.*

proceedings,[6] the most relevant decisions are those generally referred to as *Frank I, Frank II, Frank III*, and *Luft*. In *Frank I,* the Seventh Circuit rejected the argument that anyone without an ID is "disenfranchised," where all a person must do is "scrounge up" their birth certificate and stand in line at DMV:

> Plaintiffs describe registered voters who lack photo ID as "disenfranchised." If the reason they lack photo ID is that the state has made it impossible, or even hard, for them to get photo ID, then "disfranchised" might be an apt description. But if photo ID is available to people willing to scrounge up a birth certificate and stand in line at the office that issues drivers' licenses, then all we know from the fact that a particular person lacks a photo ID is that he was unwilling to invest the necessary time. And *Crawford* tells us that "the inconvenience of making a trip to the [department of motor vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."

*Frank v. Walker*, 768 F.3d 744, 748 (7th Cir. 2014).

The court also held that the paperwork component of the ID issuance process is not an infringement on the right to vote, and that "unless Wisconsin makes it needlessly hard to get photo ID, it has not denied anything to any voter." *Id.* at 753.

---

*Walker*, 196 F. Supp. 3d 893 (7th Cir. 2020); *Frank v. Walker*, No. 16-3003, 2016 WL 4224616 (7th Cir. Aug. 10, 2016); *Frank v. Walker*, 835 F.3d 649 (7th Cir. 2016); *Luft v. Evers,* 963 F.3d 665 (7th Cir. 2020).

[6] *Frank v. Walker*, 574 U.S. 929 (2014); *Frank v. Walker*, 575 U.S. 913 (2015).

In *Frank II*, the court acknowledged the possibility of future as-applied challenges, and established the standard for any such inquiry: whether voters are "unable to get acceptable photo ID with reasonable effort." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016).

The Seventh Circuit next addressed the IDPP in *Frank III*, where it denied an *en banc* hearing because "'initiation' of the IDPP means only that the voter must show up at a DMV with as much as he or she has, and that the State will not refuse to recognize the 'initiation' of the process because a birth certificate, proof of citizenship, Social Security card, or other particular document is missing." *Frank v. Walker*, 835 F.3d 649, 651–52 (7th Cir. 2016).

The Seventh Circuit *Luft* decision vacated a district court decision holding that the IDPP is unconstitutional. *Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020). It reiterated that "the state's process, *as the state describes it*, is adequate" if reliably implemented. *Id.*

The *Luft* decision includes several observations and rulings that are important to this remand. The Seventh Circuit's understanding of the IDPP is a process where "[p]eople who lack the documents required to receive a photo ID may petition the state for assistance and a temporary receipt." *Id.* at 669. It explained that the process issues a credential as a matter of course to those who initiate the process:

5

> The state's procedure gives each person claiming eligibility to vote a rebuttable presumption of eligibility: on receipt of designated materials, the state issues a credential as a matter of course (though the person may need to appear to be photographed). . . . Administrative steps such as gathering documents, making a trip, and posing for a photograph, are no more than what *Crawford* . . . considered reasonable. Those who find it difficult to assemble the required documentation face "somewhat heavier" burdens. . . . To prevent the burden from becoming excessive, Wisconsin promised to provide photo ID to anyone who, "more likely than not", meets the requirements.

*Id.* at 679–80 (citation omitted).

The question on remand is whether this process is implemented reliably to provide a qualifying ID to anyone who more likely than not meets the requirements. *Id.* at 679. The court pointed out that prior administrative procedures might cause questions about reliability, such as Johnny Randle's denial after two in-person visits and name-change complexities. *Id.* at 680. However, the court also expressed support for the state's flexible approach to solutions and emphasized that the Defendants should be free to find solutions to problems. *Id.* Indeed, it specifically recognized the changes to the name-discrepancy issue following Mr. Randle's situation as an example of such problem solving. *Id.* ("Wisconsin allows common-law name changes for driver's licenses and the like, and its new petition process requires the officials to accept a name change when an applicant submits a statement declaring the common-law elements as well as the prior name. . . .")

The court also included an important limitation on any remand remedies; any additional adjustments to the IDPP "must not order any relief

that excuses applicants from the failure to comply with reasonable requests for information that is material to voting eligibility." *Id.* at 680.

Taken together, the Seventh Circuit in multiple rulings has approved the IDPP as a process. It is settled law that there is no constitutional problem with a person getting a voting compliant ID by gathering what documents they have, going to the DMV to fill out forms and have a picture taken, or being required to respond to reasonable requests for information. Those are the standards of reliability that should be applied on remand. The question now is whether that process is being implemented reliably on an as-applied basis, such that people actually are getting a voting credential if they gather their documents and go to the DMV. The evidence confirms that the process is being implemented reliably, and it is time to dismiss the remaining claims and conclude this case.

## II.   The IDPP automatically issues a voting-compliant ID to anyone who applies.

Any person who merely *applies* with the IDPP *automatically* gets a voting compliant ID. And they maintain an ID for the entire time their application is pending. DMV asks for information to process the application and only denies it if it finds that the person is ineligible or does not respond to requests. Even then, someone who does not respond has a valid ID for at least

seven months and can get a new one anytime by merely calling or otherwise contacting DMV.

The process is established by statute and implemented by DMV procedures. Prior filings in this court have exhaustively examined the processes, so a full recitation of the IDPP procedures is not repeated here, but an abbreviated statutory overview follows.

The IDPP is initiated with a petition from someone who does not have the document normally required to get a photo ID. Wis. Stat. § 343.165(8)(b)(1). The petition requires that an applicant provide basic information about him- or herself and contact information. Upon completing that form, each applicant gets a photo receipt that is a voting-qualified ID within five days,[7] or within 24 hours if it is within seven days before or two days after an election. Wis. Stat. § 343.50(1)(c). That receipt is automatically renewed for the entire time the application is pending. Wis. Stat. § 343.50(1)(c).

DMV then coordinates with Department of Health Services ("DHS"), which attempts to verify the applicant's birth records within DHS, or with other state or federal agency information. Wis. Stat. § 343.165(8)(2). If DHS cannot confirm the birth details provided, it advises DMV, which transfers the

---

[7] By statute, receipts must be issued not later than the sixth working day after the petition. Wis. Stat. § 343.50(1)(c)2.a. However, DMV procedure is to issue the receipt within five days. (OWI Dkt. 351 ¶ 8.)

application to the Compliance, Audit and Fraud Unit ("CAFU") for follow-up with the applicant. Wis. Stat. § 343.165(8)(b)(3). CAFU then "investigate[s] the petition and any additional information" the customer provides "with prompt and due diligence," using all reasonable efforts to locate and obtain secondary documentation to confirm any details missing from the application. Wis. Stat. § 343.165(8)(b)(3).

To facilitate this work, DMV contacts the applicant to get information that could help verify their identity. Wis. Stat. § 343.165(8)(2). If the customer does not respond to such inquiry, DMV attempts to contact them at least three times, uses a CLEAR background check to attempt to find them, brings the application before a committee to generate ideas for contacting them, and waits for at least seven months before cancelling the application; during this time, the applicant continues to get voting-complaint IDs in the mail. Wis. Stat. § 343.165(8)(2); (OWI Dkt. 351 ¶ 13–15.) If at any point the applicant communicates with DMV with so much as a phone call or email—including after an application is denied—processing resumes and DMV mails the customer a credential that is valid for voting. (OWI Dkt. 351 ¶ 15.) Thus, an applicant whose application was denied for non-response to reasonable requests for information can place a single call to DMV to get an ID without another trip to a DMV office.

9

## ARGUMENT

The question on remand is whether particular eligible voters can get a voting-compliant ID with reasonable effort. The answer is yes, because any person who makes one trip to the DMV and fills out simple application forms automatically gets a voting-compliant ID. This is true whether the person has any particular document or even whether the application is facially complete. This "surely does not qualify as a substantial burden on the right to vote" and Plaintiffs cannot show that getting a qualifying ID is "needlessly hard." *Crawford*, 553 U.S. at 198; *Frank*, 766 F.3d at 753.

Evidence shows that the IDPP is working reliably. DMV is efficiently processing applications and issuing IDs. Evidence also shows the critical role that DMV's diligence process plays, by the fact that DMV has identified, and cancelled, applications from noncitizens and people applying under multiple identities.

And, while the basic customer experience of getting an ID upon one visit to the DMV has not changed, internal improvements have drastically increased efficiency, decreased errors, and streamlined solutions to the more-common challenges to identity verification.

Finally, both DMV and the Wisconsin Elections Commission ("WELEC") publicize the IDPP through several channels including websites, social media, in-person contact at DMV centers, direct mailing and by coordination with

outreach groups. Individuals who need a free ID for voting can learn about the process—and then obtain an ID—with little effort.

## I.    Summary judgment standards.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 mandates judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celetox Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## II.    The IDPP allows any eligible voter to quickly and easily get a voting credential.

Every single IDPP applicant is mailed an ID document within five days of application, and within 24 hours by overnight mail near an election. This is true whether or not the applicant provides any documents or even whether or not the application is facially complete. (Boardman Decl. ¶ 4.)

This process, which is now largely automated, answers the question on remand. Much effort has been spent in these cases examining the internal DMV processes for issuing IDs, but what really matters is the voter experience, which is, as the Seventh Circuit acknowledged, "the state issues a credential as a matter of course." *Luft,* 963 F.3d at 679–681.

The credential is referred to as a "receipt" but is actually a statutorily recognized voter identification document. The receipt is printed on secure paper, with a color photo, and includes all of the information required under Wis. Stat. § 343.50(1)(c). (Boardman Decl. ¶ 5.) That ID is valid for 60 days and is automatically renewed for the entire time an application is pending. (Boardman Decl. ¶ 6.)

The IDPP can also result in an applicant getting a plastic ID card that is valid for 8 years, known as a "hard card." But the ID document "receipt" is a state-issued photo ID that is valid for voting. (Boardman Decl. ¶ 7.) Accordingly, all it takes to get a voting-compliant ID is for an applicant to go to the DMV and fill out the required application forms as best they can and with any information they have available. (Boardman Decl. ¶ 8.) There can be no dispute that this process falls within the "reasonable effort" boundaries of the Constitution as set forth in *Crawford*, *Frank I,* and *Luft.*

There are only three ways that a person who fills out an IDPP application will no longer automatically receive renewed IDs by mail: (1) if the applicant cancels the application; (2) if DMV finds that they are ineligible for the ID and cancels the application; or (3) if DMV requests information about the application and the applicant fails to respond for seven months. (Boardman Decl. ¶ 11.)

An applicant does not have to proactively contact DMV or "check in" to keep receiving ID documents. If DMV does not have any questions for the applicant, then DMV continues researching the application and the applicant keeps receiving ID receipts automatically—or a hard card, if DMV has sufficient information to know that the person is authorized to receive an 8-year card. (Boardman Decl. ¶ 12 .)

Applicants' only obligation is to comply with reasonable requests for information. For example, in the minority of cases where follow-up may be needed, CAFU may call an applicant and ask where they were born, which can be a critical question for establishing U.S. citizenship. The applicant is required to respond to this reasonable request for information. CAFU will then use the information supplied by the applicant to verify U.S. citizenship. During CAFU's investigation, the applicant need not do anything to continue getting a renewed ID document in the mail, even if the time period between CAFU contacts exceeds the 60-day term of the document. A new receipt will simply be automatically mailed to the applicant. (Boardman Decl. ¶ 13.)

An application will be suspended only if DMV requests information from an applicant and the applicant does not respond. First, DMV conducts a multi-attempt, 30-day process to contact the applicant (two letters, and at least one phone call or e-mail, based upon the contact information on file). After that month of non-contact, DMV suspends the application for 180 days, during

which DMV continues to review the application in a committee that works to identify other ways to contact the applicant. During that time DMV also runs CLEAR record reports quarterly to try to identify additional contact information. Throughout that 180-day period, the applicant continues to automatically receive renewed ID documents. (Boardman Decl. ¶ 14.) Thus, a person who fills out a petition at a DMV center will have a voting-qualifying ID sent to them for a minimum of seven months, even if he or she completely refuses to cooperate with requests for information or even refuses to answer the phone when DMV calls. (Boardman Decl. ¶15.) In this respect, the IDPP provides *more* than what is required by the Constitution. *See Luft*, 963 F.3d at 680 (applicants cannot be excused "from the failure to comply with reasonable requests for information that is material to voting eligibility.").

Plaintiffs' pre-remand arguments centered on the application processing steps of individual applicants. However, the Supreme Court and Seventh Circuit have held that "because the 'right to vote in any manner ... [is not] absolute' and the government must play an 'active role in structuring elections', election laws 'invariably impose some burden upon individual voters.'" *Luft*, 963 F.3d at 671–72 (quoting *Burdick v. Takushi*, 504 U.S. 428, at 433 (1992)). Any election regulation "is going to exclude, either de jure or de facto, some people from voting; the constitutional question is whether the

14

restriction and resulting exclusion are reasonable given the interest the restriction serves." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

The balance of burdens and benefits of any election system is "quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry." *Id.* at 1131. On remand, Plaintiffs burden cannot be met by showing individual cases of inconvenience; they must demonstrate that "Wisconsin makes it needlessly hard to get photo ID. *Frank*, 766 F.3d at 753. They can make no such showing, because ID issuance is automatic under the IDPP.

### III.   Evidence confirms that applicants get a voting credential with minimal effort.

Since the 2016 election, 10,046 people have entered the IDPP and every single one has been issued a voting-compliant ID. (Boardman Decl. ¶¶ 4, 9.) Many got an 8-year hard card, but even that is not the correct measure of the program's success. The constitutional inquiry is whether an eligible voter can get an ID with reasonable effort, and the IDPP "receipt" meets this requirement. *Frank*, 768 F.3d at 748, 753; *Frank*, 835 F.3d at 651–52; *Luft*, 963 F.3d at 679–80.

Above and beyond what is constitutionally required to facilitate voting, many applicants who use the IDPP receive an 8-year ID hard card based upon a quick verification from DHS, without any additional questions or follow-up

from DMV. For example, of the 10,046 IDPP applications received between November 1, 2016 and July 31, 2020, 3,415 were quickly verified by DHS without any additional follow-up by the applicant. 1005 reached CAFU,[8] but the majority of those (624 applications) quickly received a hard-card upon re-submission to DHS. Only 381 applications (3.8%) required the extraordinary proof process. (Boardman Decl. ¶ 9.)

Applicants K.C.[9] and T.R are examples where, like the vast majority of applicants, issues were quickly resolved through the DHS process. (Boardman Decl. ¶ 28, Ex. B, C.) T.R. applied for an ID on August 27, 2020 with no birth certificate. T.R.'s application was verified with DHS on the same day T.R. applied, and T.R. was promptly issued an ID card. K.C. also applied that day without full documentation; his information also verified on August 27 and his ID was issued. Neither had any follow-up with DMV, and their applications did not need to reach CAFU. (Boardman Decl. ¶ 28, Ex. B, C.) Both K.C. and T.R. were mailed a hard card within 5 days of their visit to the DMV. Their

---

[8] The DHS verifications and CAFU-resolved applications do not equal the total because many applications are cancelled, such as the 3,798 that were cancelled by the applicant, which usually happens when they get an ID outside of the IDPP and no longer need the process.

[9] Applicants are referred to in this brief by initial and without pronouns. Full details of the applications are included in the exhibits to the Boardman declaration that are filed under seal.

experiences are the typical and reflect the experience of the majority of IDPP applicants.

G.T. and J.M. are examples of applicants who had information that could not be immediately verified by DHS but where the IDPP process resolved their issue quickly by re-submitting the information to DHS (Boardman Decl. ¶ 29, Ex. D, E.) G.T. filled out application documents on January 9, 2019, and G.T.'s identity could not be immediately confirmed with DHS. The next day, on January 10, CAFU called G.T. G.T. returned the call and gave additional information about the spelling of G.T. mother's maiden name. CAFU sent the alternate spelling to DHS, which verified his identity the next day. In just two days, CAFU resolved G.T.'s petition. (Boardman Decl. ¶ 29, Ex. E.)

Similarly, J.M. applied on January 28, 2020, and the information J.M. provided did not immediately verify with DHS. J.M. did not provide a phone number, so CAFU emailed J.M. on January 29. J.M.'s sister called CAFU back the next day and was able to give additional family information. That information was immediately sent to DHS, which verified the information on January 30. The application was resolved in two days. (Boardman Decl. ¶ 29, Ex. D.)

If DHS cannot verify an applicant's information due to a name-usage issue, the common law name change process permits quick issuance of an ID. (Boardman Decl. ¶ 30, Ex. F, G.) For example, J.T. applied on March 11, 2020,

missing the requirements of proof of name, date of birth, and legal presence. J.T. was born in more than 90 years ago,[10] and DHS was unable to verify J.T.'s identity. On March 12, the day after the application, CAFU found information matching J.T.'s identity in the 1940 U.S. Census, but under a different name. The next day, on March 13, CAFU contacted J.T. and began making arrangements for a common law name change affidavit without requiring J.T. to make another trip to DMV. CAFU sent the form to J.T. in a pre-paid return envelope. CAFU received the completed form on April 24, 2020 and issued a J.T. a hard card. The entire process took about five weeks, which was less than the initial term of a 60-day IDPP receipt. (Boardman Decl. ¶ 30, Ex. F.)

S.J.'s application provides another, similar experience. She submitted an IDPP application on July 3, 2019. CAFU called the phone number she listed on July 10, and S.J. called back on July 11. CAFU learned that S.J. had been given a particular first name at the hospital at birth but had generally used a different name. S.J. filled out a common law name change form, DMV received the form on July 16, and the petition was approved that day, just 13 days after the initial application. (Boardman Decl. ¶ 30, Ex. G.)

A small percentage of applicants, 3.8%, do not have the standard documentation to obtain a hard card ID. For those applicants, CAFU proceeds

---

[10] J.T.'s birthdate is filed under seal in Exhibit F to the Boardman Declaration.

to seek secondary documentation.  Through that process, hard card IDs are routinely issued to people without access to traditional identity documents. For example, D.P. filled out application documents on July 6, 2020 with no birth certificate. However, D.P.'s application indicated that D.P. had been issued an ID in Florida. CAFU contacted Florida on July 14, and found that that Florida had a birth certificate on file. The next day, on July 15, the application was approved through the extraordinary proof process, just nine days after the petition and with no further effort by the petitioner.  (Boardman Decl. ¶ 31, Ex. H.)

And J.R. applied on November 7, 2019 without a birth certificate or social security card. J.R. was born nearly 70 years ago[11] at home in either Mississippi, Arkansas, or Chicago. CAFU contacted J.R. on December 19 and learned that the spelling of J.R.'s mother's name is unknown, as is either parents' birth date. CAFU researched records from Arkansas, Mississippi and Illinois, and on December 20, 2019 found information from the 1940 census that matched J.R.'s identity. That information led CAFU to obtain elementary school records, which led to verification with the Social Security Administration, and the petition was granted on January 30, 2020.  (Boardman Decl. ¶ 31, Ex. I.)

---

[11] J.R.'s birthdate is filed under seal in Exhibit I to the Boardman Declaration.

Even applications where extraordinary proof is unavailable are granted where it is more likely than not that the identity in the application is correct. (Boardman Decl. ¶ 31, Ex. I.) For example, D.G. filled out a petition on November 4, 2011. D.G. was born in Arkansas and did not have a birth certificate or proof of legal presence. D.G. did not appear on any census record and did not provide any additional information. The application reached an informational "dead end." However, DMV approved the application despite the dead end, on the totality of the information.  (Boardman Decl. ¶ 31, Ex. I.)

Thus, the IDPP statistics and individual examples support that every applicant, in various circumstances, has received a voting-eligible credential with reasonable (and in many cases, minimal) effort. This is all *Luft* requires.

### IV.   The IDPP verification is necessary to prevent potential identity theft or fraud.

In addition to successfully issuing ID documents to people entitled to them, the IDPP has successfully identified, and cancelled, applications by people seeking an ID as a second identity or people who are not U.S. citizens. (Boardman Decl. ¶ 33.) DMV's diligent processes are necessary to discover such applications.

DMV cancels applications where it determines that the applicant is not entitled to an ID for voting eligibility. Many such cancellations occur because DMV determines that the applicant is not a U.S. Citizen. Additionally, if DMV

learns of actual intentional criminal fraud, or of an applicant who knowingly made false statements, DMV has an obligation to report the conduct to law enforcement under Wis. Stat. § 343.165(7)(f). The knowledge element of this requirement is a very high standard, and not all cancelations of applications by non-citizens meet this standard. (Boardman Decl. ¶ 40.)

By way of a few examples, in March 2018, a person applied for an ID in the name of "R.B.H." This individual was "insisting on getting an ID and going through the IDPP." The applicant presented a social security card at the DMV office with an atypical numbering format, so DMV contacted the Social Security Administration (SSA) and sent them a copy of the card. SSA confirmed that the card was a forgery. (Boardman Decl. ¶ 34, Ex. K.)

And on September 25, 2019, a person submitted an IDPP application at the Green Bay DMV office under the name "C.F." C.F.'s identity was verified through DHS. But then on October 9, 2018, the same person applied for an ID at the Milwaukee DMV under the name E.D. with a birthdate of the same day, but just one year different. CAFU's review flagged a possible problem, and the multiple-identity attempt was verified by CAFU staff. (Boardman Decl. ¶ 35, Ex. L.)

As another example, on April 3, 2018, A.K. applied for an ID without documents establishing her citizenship and asked to use the IDPP. CAFU's investigation revealed that A.K.s home country is Ukraine and A.K. is not a

U.S. citizen. In fact, A.K. had been ordered removed from the country by an immigration judge in 2013. CAFU cancelled the application. (Boardman Decl. ¶ 36, Ex. M.)

The 60-day ID expiration plays an important role in the cancellation process. (Boardman Decl. ¶ 37.) By design, the IDPP allows anyone to immediately get a voting-compliant ID by merely applying. Thus, R.B.H. briefly had a state-issued ID based on a forged social security card, the same person had IDs in the names "C.F." and "E.D.," and A.K. had an ID indicating that she is eligible to vote. The 60-day term is a safeguard that allows DMV to unilaterally cancel processing those IDs. If any of those people received an 8-year card, or even a 180-day card, they would have had facially valid ID for the entire term of the document, which creates a long-term potential for fraud. Because there is no effective way to revoke an ID in the possession of an applicant, a relatively short validity period for receipts is a simple and effective safeguard against long-term improper identification. (Boardman Decl. ¶ 38.)

Additionally, mailing these IDs, as opposed to electronic delivery, is important because it is on secure paper, includes a color photograph, and confirms one's Wisconsin residency. Emailing an image of the ID document and letting people print them on ordinary paper on black and white printers would make them very easy to forge. (Boardman Decl. ¶ 39.) This would create a substantial risk of fraud.

22

## V.   Behind the scenes, the IDPP has been improved to be easier and quicker than ever.

From an applicant's perspective, the core critical function of the IDPP remains unchanged: anyone who fills out the applications at the DMV automatically gets a voting credential. But, as the Seventh Circuit alluded to, DMV's experience over the past years has led to improvements to its internal processes and its extraordinary proof procedures. Improvement ideas come from staff, management, and advocacy groups. (Boardman Decl. ¶ 16). These internal improvements further facilitate obtaining a voting ID with only reasonable effort.

Recent improvements range from relatively minor process adjustments that increase speed and decrease errors (such as automating ID document printing), to more substantive changes to CAFU investigation practices. (Boardman Decl. ¶ 17).

### A.   New procedures reduce delays and result in more effective and efficient identity verification.

In the past, CAFU experienced challenges and delays getting birth record information from some states. It has opened lines of communication with other states' motor vehicle departments for assistance. This has resulted in faster, and better, information matching.  (Boardman Decl. ¶ 18).

CAFU has also found that it is sometimes possible to verify that an IDPP applicant previously possessed an ID from another jurisdiction. If that other

23

state's process included verification of the applicant's name, date of birth, citizenship, and social security number, a Wisconsin hard card can be issued based on confirmation from the other jurisdiction. CAFU accordingly now checks with states where an applicant previously had an ID card or driver license to see if that previous issuance met Wisconsin's requirements, even if the applicant does not have the applicable documents now. For example, if a person does not have a birth certificate, but obtained a driver license from another state which required verification of birth records, Wisconsin DMV will now issue a hard card without needing the person's birth certificate. (Boardman Decl. ¶ 19).

CAFU has also learned that marriage licenses can sometimes resolve name-change issues and now regularly checks marriage licenses as part of its investigations. (Boardman Decl. 22). And DMV has expanded its service center hours the week of elections, as well as the "Voter ID" hotline hours. (Boardman Decl. ¶ 23).

### B. New procedures prevent applicants from having to make additional trips to the DMV.

DMV now accepts documents by email and photograph. For example, a person can take a smartphone picture of a family bible entry and send it to DMV. And applicants no longer need to fill out a common law name change

affidavit at a DMV service center. They can fill out their portion, take a picture or scan it, and DMV fills out the rest from its offices. (Boardman Decl. ¶ 20).

### C.   New processes help DMV stay in contact with applicants.

DMV has instituted a process for generating additional ideas on how to contact an applicant before denying an application if the applicant has not responded to a request for additional information. A DMV committee reviews each file where CAFU can no longer contact an applicant and reviews the communication attempts for any additional ideas or leads. (Boardman Decl. ¶ 21).

### D.   New processes, automation, and DMV's experiences have effectively eliminated errors.

The automation of certain steps in recent years, such as transmitting application documents to DMV's central office in Madison, and the automated printing of IDPP takeaway documents and receipts, has so improved these processes that the possibility of human error is virtually eliminated. For example, error analyses from the spring 2020 election revealed zero errors between March 30, 2020 and April 10, 2020. (Boardman Decl. ¶ 26, Ex. A).

## VI.   Both DOT and the Wisconsin Elections Commission are publicizing the IDPP through multiple channels.

Both DOT and WELEC publicize the IDPP through several channels. Outreach is done digitally, in-person, through print media, direct mailing and by coordination with outreach groups.

### A.   DOT uses a broad range of tools and resources to make the public aware of the IDPP.

DOT's public awareness campaign spans its service centers, website, social media, and outreach through voter advocacy groups. The most direct contact with the public is at DMV service centers. Every service center has signs on the wall explaining the IDPP as well as handout materials in English and Spanish. DMV staff is trained to be able to explain the process to customers. (Boardman Decl. ¶ 42.)

The DOT website also includes IDPP information on its front page displaying the prominent message:

## Getting a free ID for voting is easy!
View ID card petition process

(Boardman Decl. ¶ 43.)

Additionally, consistent with the processes already approved by this Court, in the three weeks leading up to an election, DOT continues to issue at

least one press release per week; two Facebook posts a week; and five to six tweets per week, all focused on the IDPP. (Boardman Decl. ¶ 44.)

DOT also has relationships with external partners, including the League of Women Voters, Wisconsin Voices, People First Wisconsin, All Voting is Local, Center for Secure and Modern Elections, Voces de la Frontera, and other community groups. DOT meets with these groups, makes them aware of the IDPP, and takes input on how DMV services, including the IDPP, can be improved. (Boardman Decl. ¶ 45.)

### B. WELEC is publicizing the IDPP through several channels.

In 2016, WELEC conducted outreach for the IDPP as described in the "Phase Two" report filed in this case. (OWI Dkt. 304.) Outreach included printing palm cards to give to advocacy groups, distributing information to municipal clerks, and press conferences and releases. (OWI Dkt. 304:3–5.) Since 2016, WELEC has integrated many of these practices into its standard election outreach but has also made changes based upon its experiences over the past four years. (Wolfe Decl. ¶ 2.)

Since 2016, IDPP-related outreach has been integrated into all election outreach in the context of public information about the photo ID requirement. WELEC emphasizes to the public, through several channels, that voters can get a free ID if they do not have one, even if they do not have specific documents

such as a birth certificate. (Wolfe Decl. ¶ 3.) Election-related publicity and outreach is an ongoing process, but WELEC is undertaking an election-specific outreach campaign for the November 2020 election. (Wolfe Decl. ¶ 4, Ex. A.)

The voter outreach plan holistically incorporates voter ID and IDPP-related information and includes specific IDPP outreach. (Wolfe Decl. ¶ 5, Ex. B). The outreach is multi-pronged and includes websites; coordination with advocacy groups; coordination with other state agencies; direct mailings; a media strategy including using an advertising firm, press releases and press conferences; outreach training for local election officials;  and a phone bank to answer question from voters, including those who may not have internet access. (Wolfe Decl. ¶ 6.)

Websites are a prominent information source for people with questions about elections and voting. WELEC maintains three websites which serve as a public repository of election information as well as a resource for people with election-related questions. Each of the websites includes information about getting a free ID for voting on its front page. (Wolfe Decl. ¶7.)

Most relevant here, the Bring it to the Ballot website https://bringit.wi.gov/ is devoted entirely to photo ID requirements. It includes multiple prominent front-page links to updated information about the IDPP, including videos and text explaining that voters can get an ID from the DMV without a birth certificate. (Wolfe Decl. ¶ 10.)

28

WELEC's main organizational website is https://elections.wi.gov/. That website includes information about ID cards on its front page, which includes links to additional information:

### Free State ID Cards for People without Birth Certificates



The Wisconsin Division of Motor Vehicles will help people get a free state ID card or document that can be used for voting after just one visit to the DMV, even if they don't have a birth certificate or other documentation. Get the ID Petition Process brochure in English and Spanish.

(Wolfe Decl. ¶ 8.)

Another website, MyVote https://myvote.wi.gov/en-us/ is a functional website that allows people to find their polling place, see if they are registered to vote, and register if needed, among other features. That website includes front-page information about the ID requirement and links to information about how to get an ID, including the ID petition process. (Wolfe Decl. ¶ 9.)

On the non-digital front, WELEC coordinates outreach through its Elections Commission Accessibility Advisory Committee. WELEC creates materials and provides them to committee members who in turn distribute them to their contacts. They also post materials to their websites and share information through their social media channels. At the same time, WELEC also distributes updates through its own social media channels. (Wolfe Decl. ¶ 12.)

Members of the Elections Commission Accessibility Advisory Committee include:

- Disability Rights Wisconsin
- Wisconsin Board for People with Developmental Disabilities
- Access to Independence
- Wisconsin Coalition of Independent Living Centers
- Coalition of Wisconsin Aging Groups
- City of Madison, Civil Rights Division
- National Alliance for the Mentally Ill
- People First Wisconsin
- Wisconsin Council of the Blind and Visually Impaired
- Greater Wisconsin Agency on Aging Resources
- Wisconsin Association of the Deaf
- National Federation of the Blind

(Wolfe Decl. ¶ 13.)

WELEC also maintains contact with several voter advocacy groups, including but not limited to the NAACP Milwaukee Branch, the Milwaukee Urban League, and Jack & Jill of America, Inc. Milwaukee Chapter. WELEC also offers press invitations to several organizations including Vote Riders and the League of Women Voters. (Wolfe Decl. ¶ 14.) It provides support, training and resources for these advocacy groups who can target their constituent voters, including those who are not likely to be connected to social media or the internet. Although WELEC is not able to conduct on-the-ground outreach due

to staff and budget constraints, the agency works with its outreach partners who can conduct meaningful outreach. (Wolfe Decl. ¶ 15.)

In the past, WELEC printed palm cards, handouts, and other paper resources to give to advocacy groups or clerks. (*See* OWI Dkt. 304:3.) However, it found that no one wanted those paper documents, and still has boxes of paper documents from 2016 that it was unable to give away. Because the last printed documents went unused, WELEC is not planning to produce additional printed documents. (Wolfe Decl. ¶ 16.)

WELEC also coordinates outreach through other state agencies. For example, earlier this year DHS sent information on voting for nursing home residents with photo ID-related information. That distribution went to all nursing homes and assisted living providers in the state, in addition to other entities that provide residential treatment services, as well as advocacy organizations working with these populations. In total, it went to about 15,000 email addresses. (Wolfe Decl. ¶ 17.) WELEC additionally coordinates with DOT about media strategies, and for accurate publicization of processes near an election, for example regarding overnight mailing of receipts near elections and the provisional ballot process. (Wolfe Decl. ¶ 18.)

WELEC also recently sent a mailing to approximately 2.6 million Wisconsin voters who do not have an absentee ballot request on file. This mailing included a reminder that most people need an ID to vote, directed

people to the bringit.wi.gov website to "learn how to get a photo ID for free, if you don't have one" and included a phone number to call for more information. (Wolfe Decl. ¶19, Ex. C.)

WELEC has been, and will continue to, conduct news conferences between now and the election. These will include information about getting a free ID for voting by bringing whatever documents a person has to the DMV. For example, WELEC Administrator Meagan Wolfe discussed the process in a recent September 3 media conference, which was well attended. She generally does not reference the "ID Petition Process" by name, because the phrase itself is not a particularly useful way to communicate the process to people who need it. Instead, Administrator Wolfe focuses on encouraging anyone without an ID to gather what documents they have and go to the DMV. (Wolfe Decl. ¶ 20.)

In addition to its own outreach, WELEC has also hired an advertising agency to assist with voter outreach. The agency, KW2-Madison, has significant experience developing media campaigns for state government. (Wolfe Decl. ¶ 21.) Among other things, KW2-Madison studied how voting information can be most effectively transmitted to voters. It found that information is more effective when it comes from local municipalities than from statewide sources. For that reason, giving information and resources to local election officials is an important part of WELEC's election outreach. WELEC

makes all of its IDPP-related media available to municipalities, including palm cards, posters, and video and audio commercials. (Wolfe Decl. ¶ 22.)

In addition to clerk, media, and group resources, WELEC is taking measures to be available for individual voters, including those who may not have access to internet resources. The September 1 mailing reached every registered voter who does not have an absentee ballot request already on file. (Wolfe Decl. ¶ 23.) WELEC staff, with the assistance of a phone bank, has also set up a telephone hotline (1-866-VOTEWIS) for election-related questions. Information about how to get a free ID for voting is among the information that will be available by calling the hotline. (Wolfe Decl. ¶ 24.)

In 2020, WELEC will spend approximately $600,000 on voter outreach using federal funds that can be spent only on authorized outreach. WELEC does not receive any additional state appropriations or federal grants for photo ID specific outreach to voters. (Wolfe Decl. ¶ 26.) The IDPP is a critical part of the Wisconsin election system, but it is only one of many parts that require public awareness. WELEC is a public agency with limited funding and resources. The current IDPP-related outreach is the best use of available resources, and the best balance of the various elements of critical information that needs to be publicized before an election. (Wolfe Decl. ¶ 25.)

The variety and frequency of communications throughout the state, from both DOT and WELEC, make it likely that any voter who may need an ID will be aware that he or she can get one at a DMV service center.

## CONCLUSION

The IDPP is reliably issuing an ID to anyone who goes to the DMV, has a photo taken, and fills out the application forms. This process "ensures that every eligible voter can get a qualifying photo ID with reasonable effort," which is precisely what the Seventh Circuit required. *Luft*, 963 F.3d at 679. And WELEC's multichannel publicity ensures that the public is aware that people who need an ID for voting can get one at the DMV. Plaintiffs have no remaining meritorious claim, and these long-litigated cases are ready to conclude.

Dated this 18th day of September, 2020.

Respectfully submitted,

ERIC J. WILSON
Deputy Attorney General of Wisconsin

Electronically signed by:

s/S. Michael Murphy
S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 267-8904 (Johnson-Karp)
(608) 266-3094 (Schmelzer)
(608) 267-2223 (Fax)
murphysm@doj.state.wi.us
johnsonkarpg@doj.state.wi.us
schmelzerjj@doj.state.wi.us