IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ONE WISCONSIN INSTITUTE, INC., et al.,

    Plaintiffs,

    v.                      Case No. 15-CV-324

MARK L. THOMSEN, et al.,

    Defendants.

---

JUSTIN LUFT, et al.,

    Plaintiffs,

    v.                      Case No. 20-CV-768

TONY EVERS, et al.,

    Defendants.

---

**DECLARATION OF KRISTINA BOARDMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMARY JUDGMENT ON REMAND FROM THE SEVENTH CIRCUIT COURT OF APPEALS**

---

I, KRISTINA BOARDMAN, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Administrator of the Wisconsin Department of Transportation, Division of Motor Vehicles (DMV). Among other duties, I oversee the ID Petition Process (IDPP).

2. I make this affidavit in support of the Defendants' Opening Brief on Remand from the Seventh Circuit Court of Appeals Regarding ID Petition Process and to supplement my August 11, 2020 Declaration in Support of Scheduling Memorandum and IDPP Petition Process Status Update.

3. The IDPP is a process for a person to get a voting-compliant ID if the person does not have access to documents or information typically required to get an ID, such as evidence of name, date of birth, identity, citizenship, social security number, or Wisconsin residency.

4. Every single IDPP applicant is mailed an ID document within 5 days of application, and within 24 hours by overnight mail near an election. This is true whether or not the applicant provides any documents or even whether or not the application is facially complete.

5. This ID is referred to as a "receipt" but is actually a statutorily recognized identification document. The receipt is printed, on secure paper, with a color photo, and includes all of the information required under Wis. Stat. § 343.50(1)(c).

6. That ID is valid for 60 days and is automatically renewed for the entire time an application is pending.

7. The IDPP can also result in an applicant getting a plastic ID card that is valid for 8 years, known as a "hard card." But the ID document "receipt" is a state-issued photo ID that is valid for voting.

8. Accordingly, all it takes to get a voting-compliant ID is for an applicant to go to the DMV and fill out the required application forms as best they can and with any information they have available.

9. Many applicants who use the IDPP receive an 8-year ID hard card based upon a quick verification from DHS, without any additional questions or follow-up from DMV. For example, of the 10,046 IDPP applications received between November 1, 2016 and July 31, 2020, 3,415 (34%) were quickly verified by DHS without any additional follow-up by the applicant. 1005 reached CAFU but the majority (624 applications or 62%) were then quickly issued upon re-submission to DHS. Only 381 applications (3.8%) required the extraordinary proof process.

10. Of the remaining, 3,798 were cancelled by the applicant, which usually happens when they get an ID outside of the IDPP and no longer need the process. An additional 163 applications were cancelled because the applicant moved out of state and 29 applications were cancelled due to fraud or ineligibility. 861 applications have been denied and 775 remain in a pending or suspended status, and the applicant continues to receive receipts valid for voting.

11. There are only three ways that a person who fills out an IDPP application will no longer automatically receive renewed IDs by mail: (1) if the applicant cancels the application; (2) if DMV finds that they are ineligible for

the ID and cancels the application; or (3) if DMV requests information about the application and the applicant fails to respond for seven months.

12. An applicant does not have to proactively contact DMV or "check in" to keep receiving ID documents. If DMV does not have any questions for the applicant, then DMV continues processing the application and the applicant keeps receiving ID receipts automatically, or a hard card, if DMV obtains sufficient information.

13. Applicants' only obligation is to comply with reasonable requests for information. For example, in the approximately 20% of cases where follow-up may be needed, CAFU may call an applicant and ask where they were born, which can be a critical question for establishing U.S. citizenship. The applicant is required to respond to this reasonable request for information. CAFU will then use the information supplied by the applicant to verify U.S. citizenship. During the time of CAFU's investigation, the applicant need not do *anything* to continue getting a renewed ID document in the mail, even if the time period between CAFU contacts exceeds the 60-day term of the document. A new receipt will simply be automatically mailed to the applicant.

14. The application suspension process only occurs if DMV requests information from an applicant and the applicant does not respond. DMV conducts a multi-attempt 30-day process to contact the applicant (two letters, and at least one phone call or e-mail, based upon the contact information on

file); suspends the application for 180 days; reviews the application in a committee that works to identify other ways to contact the applicant, and quarterly runs CLEAR record reports to try to identify additional contact information. The applicant receives renewed ID documents automatically during this entire time.

15. Thus, a person who fills out a petition at a DMV center will have a voting-qualifying ID sent to them for seven months, even if he or she completely refuses to cooperate with requests for information or even refuses to answer the phone when DMV calls.

16. DMV constantly improves all of its processes, including the IDPP. Based on its experiences administering the IDPP, DMV has made many process improvements in the last few years. Improvement ideas come from staff, management, and from input from advocacy groups.

17. Recent improvements span from relatively minor process adjustments that increase speed and decrease errors, such as automating ID document printing, to more substantive increases in CAFU investigation practices. While not an exhaustive list, some recent major improvements are described below.

18. In the past, CAFU experienced challenges and delays getting birth record information from some states. It now has opened lines of communication with other states' motor vehicle departments, for assistance in addition to vital

record queries. This has resulted in more, and better, information matching than ever before.

19. CAFU has found that it is sometimes possible to verify that a non-Wisconsin jurisdiction had previously issued an ID product or driver license to a Wisconsin IDPP applicant through a process that included verification of the applicant's name, date of birth, citizenship, and social security number. In that instance a Wisconsin hard card can be issued based on that prior process with confirmation from the other jurisdiction. CAFU accordingly now checks with states where an applicant previously had an ID card or driver license to see if that previous issuance met Wisconsin's requirements even if the applicant does not have the applicable documents now. For example, if a person does not have a birth certificate, but got a driver license from another state which required verification of birth records, Wisconsin DMV will issue a hard card without needing the person's birth certificate now.

20. DMV now accepts documents by email and photograph. For example, a person can take a smartphone picture of a family bible entry and send it to DMV. And applicants no longer need to fill out a common law name change affidavit at a DMV service center, they can fill out their portion, take a picture or scan it, and DMV fills out the rest from its offices.

21. DMV has instituted a process for generating additional ideas on how to contact an applicant before an application is denied because the

applicant has not responded to a request for additional information. A DMV committee reviews each file where CAFU can no longer contact an applicant and reviews the communication attempts for any additional ideas or leads.

22. CAFU has learned that marriage licenses can sometimes resolve name-change issues and now regularly checks marriage licenses as part of its investigations.

23. DMV has expanded its service center hours the week of elections, as well as the "Voter ID" hotline hours.

24. Indeed, regarding DMV service centers, this particular election is especially well-suited for fast and efficient IDPP processing. Due to the COVID-19 health crisis, DMV service centers have ceased in-person processing of motor vehicle transactions, such as titles and registration. This substantially reduces the in-person traffic, and wait times, at DMV offices. At the same time, all CAFU staff is working the same hours as before COVID. And all permanent DMV service centers are open, with the exception of one office in Milwaukee where the entire building is closed (five other offices remain open in Milwaukee). The net result is that DMV and CAFU have the resources available for IDPP petitions. These resources are further improved with the efficiencies that have been implemented and the reduction in in-person customers due to COVID.

25. The IDPP, now more than ever before, is successfully issuing a voting-compliant ID to anyone who gathers what documents they have and makes one trip to the DMV.

26. The automation of certain steps in recent years, such as transmitting application documents to DMV's central office in Madison, and the automated printing of IDPP takeaway documents and receipts, has so improved these processes that the possibility of human error has been largely eliminated. For example, error analyses from the spring election revealed zero errors between March 30, 2020 and April 10, 2020. True and correct copies of the error reports are attached here to as **Exhibit A.** Errors have become so rare that error reporting is now done only during elections.

27. The thousands of people who have received an ID document through the IDPP indicates its success, and a handful of examples are as follows.

28. Examples of the vast majority of applications that are quickly resolved through the DHS process are K.C.[1], as documented in the Case Activity Report (CAR) attached hereto as **Exhibit B**, and T.R., as documented

---

[1] Initials are used in place of names in this affidavit. The exhibits filed under seal and the redacted version of the brief filed with this affidavit include the full application information.

in the CAR attached hereto as **Exhibit C**. Both of these applicants were mailed a hard card within 5 days of their visit to the DMV.

29. Examples of such applications that are quickly resolved in CAFU are J.M., as documented in the CAR attached hereto as **Exhibit D**, and G.T., as documented in the CAR attached hereto as **Exhibit E**.

30. If DHS cannot verify an applicant's information due to a name-usage issue, the common law name chance process permits quick issuance of an ID. Examples of such applicants are J.T., as documented in the CAR attached hereto as **Exhibit F**, and S.J., as documented in the CAR attached hereto as **Exhibit G**.

31. Likewise, the secondary documentation process facilitates 8-year card issuance to applicants without access to traditional documents. Examples of such applicants are D.P., as documented in the CAR attached hereto as **Exhibit H**, and J.R., as documented in the CAR attached hereto as **Exhibit I**.

32. In cases where even extraordinary proof does not establish a person's identity, DMV has found that the information on an application was more likely than not correct and issued a hard card. An example is the application of D.G., as documented in the CAR attached hereto as **Exhibit J.**

33. In addition to successfully issuing ID documents to people entitled to them, the IDPP has successfully identified, and cancelled, applications by people seeking an ID as a second identity or people who are not U.S. Citizens.

34. For example, a person applied for an ID in the name of "RBH." DMV notes indicate that the applicant was "insisting on getting an ID and going through the IDPP." The person presented a social security card at the DMV office with an atypical numbering format. DMV contacted the Social Security Administration (SSA) and sent them a copy of the card that the applicant presented. SSA confirmed that the card was a forgery. A true and correct copy of the CAR documenting the forged social security card is attached hereto as **Exhibit K.**

35. As another example, on September 25, 2019 a person applied for an ID card, through the IDPP, at the Green Bay DMV office under the name "C.F." and indicating a birth date of September 20, 1979. C.F.'s identity was verified through DHS. But then on October 9, 2018, the same person applied for an ID at the Milwaukee DMV under the name E.D. and indicating a birth date of September 20, 1978. CAFU's facial recognition system flagged a possible problem and the multiple-identity attempt was verified by CAFU staff. A true and correct copy of the CAR documenting the application is attached hereto as **Exhibit L.**

36. As another example, on April 3, 2018, A.K. applied for an ID without documents establishing citizenship and asked to use the IDPP. CAFU's investigation revealed that A.K.'s home country is Ukraine, A.K. is not a U.S. Citizen and in fact was ordered removed from the country by an

immigration judge in 2013. A true and correct copy of the CAR documenting the application is attached hereto as **Exhibit M.**

37. The 60-day ID expiration plays an important role in this cancellation process.

38. By design, the IDPP allows anyone to immediately get a voting-compliant ID upon merely by *applying*. Thus, R.B.H. briefly had a state-issued ID based on a forged social security card, the same person had IDs in the names "C.F." and "E.D.", and A.K. had an ID indicating that A.K. is eligible to vote. The 60-day term is a safeguard that allowed DMV to unilaterally cancel processing of those IDs. If any of those people received an 8-year card, or even a 180-day card, they would have additional access to incorrect identification. Because there is no effective way to revoke an ID in the possession of an applicant, a relatively short validity period for receipts is a simple and effective safeguard against long-term improper identification.

39. Additionally, mailing these IDs, as opposed to electronic delivery, is important because it is on secure paper, includes a color photograph, and confirms one's Wisconsin residency. Emailing an image of the ID document and letting people print them on ordinary paper on black and white printers would make them very easy to forge.

40. DMV cancels applications where it determines that the applicant is not entitled to an ID for voting eligibility. Many such cancellations occur

because DMV determines that the applicant is not a U.S. Citizen. Because the IDPP application document makes clear that it is an application for a voting credential, and federal law prohibits noncitizens from voting in federal elections, applications by noncitizens are cancelled under the blanket category of "fraud." This is a catchall internal designation of convenience for such applications and is not a determination of intentional criminal fraud and is not necessarily referred to law enforcement. I am aware that if DMV learns of actual intentional criminal fraud, or of an applicant who knowingly made false statements, it has an obligation to report the conduct to law enforcement under Wis. Stat. § 343.165(7)(f). The knowledge element of this requirement is a very high standard. On occasion, such as the application of C.F./E.D., DMV has alerted law enforcement. However, in most cases, DMV does not refer cancellations internally designated "fraud" to law enforcement, or even use that term in the criminal law sense.

41. DOT uses a range of tools and resources to help make the public aware of the IDPP.

42. The most direct contact with the public is at DMV service centers. Every service center has signs on the wall explaining the IDPP as well as handout materials in English and Spanish. DMV staff is also trained to be able to explain the process to customers.

43. The DOT website also includes IDPP information on its front page displaying the prominent message:

## Getting a free ID for voting is easy!
View ID card petition process

44. Additionally, in the 3 weeks leading up to an election, DOT issues at least one press release per week; 2 Facebook posts a week; and 5-6 tweets per week, all focused on the IDPP.

45. DOT also has relationships with external partners, including the League of Women Voters, Wisconsin Voices, People First Wisconsin, All Voting in Local, Center for Secure and Modern Elections, Voces de la Frontera, and other community groups. DOT meets with such groups and both makes them aware of the IDPP and takes input on how DMV services, including the IDPP, can be improved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __15th__ day of September, 2020.

*Kristina Boardman*
KRISTINA BOARDMAN