## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

ONE WISCONSIN INSTITUTE, INC.,
*et al.*,

      Plaintiffs,

                              Case No. 3:15-cv-00324-JDP

     v.

MARK L. THOMSEN, *et al.*,

      Defendants.

---

JUSTIN LUFT, *et al.*,

      Plaintiffs,

     v.                              Case No. 3:20-cv-00768-JDP

TONY EVERS, Governor of Wisconsin,
*et al.*,

      Defendants.

---

### BRIEF OF THE WISCONSIN LEGISLATURE AS AMICUS CURIAE SUPPORTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS

---

       The Wisconsin Legislature files this amicus curiae brief pursuant to this Court's August 20, 2020 order granting the Legislature permission to "proceed as amicus curiae on any dispositive motions." Dkt. No. 362 at 7.[1] The Legislature respectfully requests that this Court resolve these motions by *September 28, 2020*, to

---

[1] All "Dkt." citations are to the docket in *One Wisconsin Institute v. Thomsen*, No. 3:15-cv-00324-JDP. "*Luft* Dkt." citations are to the docket in *Luft v. Evers*, No. 3:20-cv-00768-JDP.

ensure that the State has some time to exhaust potential appellate remedies, if necessary, before the October 1 deadline for implementing any changes to Wisconsin's ID Petition Process (IDPP).

Under the Seventh Circuit's limited remand, this Court's inquiry over the current version of the IDPP—the process by which the State provides free voter ID to applicants who otherwise lack qualifying identification—is confined to addressing whether two "conditions" are "met": "*Frank III* says that the state's process, *as the state describes it*, is adequate . . . , *if reliably implemented*." *Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020) (emphasis in original; citing *Frank v. Walker*, 835 F.3d 649 (7th Cir. 2016) (en banc) *(Frank III)*).

The first condition is easily satisfied as the current IDPP is, in fact, structured as the State described it on appeal in *Luft*. There are many important features of the current revised IDPP codified by the Legislature. For example, upon mere application, every applicant receives a temporary ID sufficient for voting that automatically and perpetually renews. Wis. Stat. § 343.50(1)(c)2. The State has the obligation to investigate each application to determine whether the applicant qualifies for a permanent ID. *Id.* § 343.165(8)(b)3. Additionally, the IDPP requires state officials to accept a name change when there are mismatches between an applicant's name and the name on the applicant's supporting documents. *Id.* § 343.50(3)(c). And importantly, the Legislature required that the DMV must grant an IDPP application and provide a permanent voter ID "if the department concludes, on the basis of secondary documentation *or other corroborating information*, that it is

*more likely than not* that the name, date of birth, and U.S. citizenship provided in the application is correct." *Id.* § 343.165(8)(h) (emphases added).

On the second condition, the only remaining issue is whether—notwithstanding the fact that the IDPP's processes are properly designed—there are individual circumstances in which the DMV has not "*reliably implemented*" the IDPP's processes. *Luft*, 963 F.3d at 679. This is not a question of the IDPP's design, but rather the way state agencies have implemented its requirements. And the *Anderson/Burdick* inquiry here only implicates the narrow set of eligible voters who have allegedly "f[ound] it difficult to *assemble the required documentation*" and "face[d] 'somewhat heavier' burdens" in securing identification under the IDPP compared to other eligible voters. *Id.* (emphasis added) (quoting *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 199 (2008) (controlling op. of Stevens, J.)).

As an initial matter, applicants are automatically issued temporary IDs that perpetually renew while their permanent ID applications remain pending. Wis. Stat. § 343.50(1)(c)2. During that time, while these applicants possess valid temporary voter IDs, plaintiffs have no cognizable *Anderson/Burdick* claims.

The IDPP also entails generous terms for granting *permanent* voter IDs. The vast majority of people initiating the IDPP have either been granted permanent ID almost immediately or have withdrawn from the application process because they gained permanent ID from outside the program. *See* Dkt. No. 406, September 18 Declaration of Kristina Boardman ¶ 9 (September Boardman Decl.) ("[O]f the 10,046 IDPP applications received between November 1, 2016 and July 31, 2020, 3,415 (34%)

were quickly verified by DHS without any additional follow-up by the applicant. 1005 reached CAFU but the majority (624 applications or 62%) were then quickly issued upon re-submission to DHS."); *id.* ¶ 10 ("3,798 were cancelled by the applicant, which usually happens when they get an ID outside of the IDPP and no longer need the process.").[2] Of the remaining applicants who did not reach the State's additional-documentation investigative phase (or "extraordinary proof process"), 775 are still pending, 861 were denied, 163 individuals have moved out of state, and 29 have been found ineligible. *See id.* ¶¶ 9, 10.

That leaves just 381 IDPP applicants who entered the additional-documentation investigative phase, which was designed by the Legislature to grant permanent IDs to those applicants for whom "it is more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct." Wis. Stat. § 343.165(8)(h). Crucially, while the State at this phase shoulders the burden to further investigate for documents confirming the applicant's identity, the ultimate decision about whether to grant a permanent ID accounts for the "secondary documentation *or other corroborating information*" the State uncovers or is given. *Id.* (emphasis added). And defendants have provided evidence that some of those approximately 381 people who needed to proceed to this additional-documentation phase of the State's IDPP investigation have, in fact, received permanent IDs. *See* September Boardman Decl. ¶ 32 ("In cases where even extraordinary proof does not

---

[2] Notably, *One Wisconsin Institute* plaintiffs repeatedly refer to data from September 2014, before the State implemented various reforms to the IDPP. This limited remand concerns only the current IDPP. *Luft*, 963 F.3d at 680.

establish a person's identity, DMV has found that the information on an application was more likely than not correct and issued a hard card [permanent ID].").

Ultimately, an individual plaintiff would need to satisfy a series of elements to show any as-applied *Anderson/Burdick* constitutional violations based on the State's implementation of the IDPP. Plaintiffs would need to prove to this Court that these individuals (1) are *eligible* voters; (2) who currently lack sufficient voter ID; and (3) they cannot "obtain[] with reasonable effort," *Luft*, 963 F.3d at 680, *any* "documentation deemed acceptable to the department of transportation" or "other corroborating evidence" necessary to get a free voter ID under the IDPP; (4) when the State also has not been able to independently uncover any such documentation or other supporting information during its own statutorily required investigation (triggered by the mere initiation of the IDPP); and (5) when it is "more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct," Wis. Stat. § 343.165(8)(h); *id.* § 343.165(8)(b)3g.

Given the structural validity of the IDPP, any potential remedy must be tailored to those individual voters satisfying all those elements—rather than redesigning the IDPP's structure for all other voters. Just as *Frank II* held that "[e]very citizen's interest in individual treatment [] is strong," *Luft*, 963 F.3d at 680, it also held "the burden some voters faced [cannot] prevent the state from applying the law generally," *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (*Frank II* ).

Because the State's IDPP is as-described and has been reliably implemented, the IDPP is constitutionally "adequate" under *Frank III. Luft*, 963 F.3d at 679. The

Court should uphold the IDPP in its entirety. In the event that this Court concludes that there are specific, individual voters for whom the IDPP has not been reliably implemented, this Court's relief must be limited to those specific voters. And if those specific voters have suffered *Anderson/Burdick* violations based on the fact that (1) an investigation is not "prompt," Wis. Stat. § 343.165(8)(b)3; (2) officials are not properly applying the "more likely than not" standard, *id.* § 343.165(8)(h); or (3) officials are not properly considering any "corroborating information," *id.*, then this Court should *at most* order state officials to comply with these state statutory standards as a remedy for possible federal violations. *See Komyatti v. Bayh*, 96 F.3d 955, 960 (7th Cir. 1996). In all events, broad, programmatic reforms to the IDPP are foreclosed by *Frank II*, *Frank III*, and *Luft*.

## I. The Current IDPP's Statutory Structure Is Fully Valid, And Any Deficiencies Are Limited To Exceptional Cases of Implementation.

The Seventh Circuit in *Luft* approved (1) the structure of the current IDPP, if it is as the State described it on appeal, and (2) the IDPP's enforcement to all eligible voters, if it has been reliably implemented: "*Frank III* says that the state's process, *as the state describes it*, is [constitutionally] adequate . . . *if reliably implemented.*" *Luft*, 963 F.3d at 679 (emphasis in original; citing *Frank III*, 835 F.3d 649).

In other words, if the current IDPP is "*as the state describes it*," then the IDPP's general structure is constitutional, so there are not *classes* of eligible voters who cannot secure free ID after expending reasonable effort. *Id.* As the defendants' declarations and brief confirms, the current IDPP is, in fact, as the State described it on appeal: The current IDPP (1) ensures that *every* applicant receives temporary

identification "as a matter of course," which may only be *withdrawn* after a finding

of ineligibility, *id.*; (2) allows applicants to prove their eligibility for permanent IDs

through any "documentation deemed acceptable to the department of transportation,"

Wis. Stat. § 343.165(8)(b)3g, "or *other corroborating information*," *id.* § 343.165(8)(h)

(emphasis added); (3) requires the State to "investigate the petition and any

additional information provided under this subdivision with prompt and due

diligence and shall use reasonable efforts to locate and obtain the secondary

documentation by pursuing leads provided by the person," *id.* § 343.165(8)(b)3; and

(4) ultimately grants any application for permanent ID if "it is more likely than not

that the name, date of birth, and U.S. citizenship provided in the application is

correct," *id.* § 343.165(8)(h); *see also* Defs. Br. at 7-9.

Thus the only remaining challenges to the IDPP would involve individualized

questions about whether the otherwise valid IDPP has not been "*reliably

implemented*" by the DMV for specific eligible voters. *Luft*, 963 F.3d at 679. And any

possible judicial relief on that basis would need to be tailored to those individual

voters and their precise circumstances.

### A. The Current IDPP's Process Is "As the State Describes It" On Appeal.

There can be no dispute that the IDPP is structured as the State previously

described to the Seventh Circuit.

The Legislature codified the IDPP as revised in 2016 into statute. First,

codifying one of the most significant 2016 revisions to the IDPP, the State issues

"temporary identification card[s] while the application is being processed" as soon as

individuals submit their applications—even if an applicant submits an incomplete application. Wis. Stat. § 343.50(1)(c)1. This temporary ID automatically and perpetually renews for as long as the application for permanent ID is pending. *Id.* § 343.50(1)(c)2.a ("The department shall issue a new receipt to the person not later than 10 days before the expiration date of the prior receipt, and having a date of issuance that is the same as the expiration date of the prior receipt.").

The DMV is then required to initiate its own investigation. At the outset, the DMV forwards information from the application for verification:

> The department of transportation shall provide the person's birth record information to the department of health services, for the sole purpose of verification by the department of health services of the person's birth certificate . . . or to a federal agency for the sole purpose of verifying the person's certificate of birth abroad issued by the federal department of state, or of verifying the person's alien or U.S. citizenship and immigration service number or U.S. citizenship certificate number.

*Id.* § 343.165(8)(b)2. If the department of transportation cannot verify the information, "the department shall promptly notify the person in writing of that failure to verify and request the person contact the department within 10 days." *Id.* § 343.165(8)(b)3.

From there, state agency officials undertake an additional-documentation investigation of the IDPP application, and they must grant the application for permanent ID if they conclude that it is "more likely than not"—based on a generous range of acceptable evidence—that the information in the application is correct and the applicant is qualified for a voter ID: The DMV "*shall grant* a petition if the department concludes, on the basis of secondary documentation *or other corroborating information*, that it is more likely than not that the name, date of birth,

and U.S. citizenship provided in the application is correct." *Id.* § 343.165(8)(h) (emphases added). Notably, "secondary documentation" includes baptismal certificates, hospital birth certificates, delayed birth certificates, census records, early school records, family bible records, and doctors' records of post-natal care—as well as *any* "documentation deemed acceptable to the department of transportation." *Id.* § 343.165(8)(b)3g.

State statutory law requires "prompt and due diligence" from the DMV to help the applicant locate documents or information in support of the IDPP application: "The department shall investigate the petition and any additional information provided under this subdivision with prompt and due diligence and shall use reasonable efforts to locate and obtain the secondary documentation by pursuing leads provided by the person." *Id.* § 343.165(8)(b)3. And, in another important 2016 revision, the State may accept name changes when there are mismatches between an applicant's name and the name on the applicant's supporting documents: "[T]he department may issue an identification card bearing a name other than the name that appears on a supporting document if the person provides evidence acceptable to the department that the person has used the name in a manner that qualifies the name as being legally changed under the common law of Wisconsin[.]" *Id.* § 343.50(3)(c).

Finally, if the State concludes that an applicant has not met this generous "more likely than not" standard and denies an application, "[t]he denial of a

petition . . . is subject to judicial review in the manner provided in ch. 227 for the review of administrative decisions." *Id.* § 343.165(8)(e).

As codified by the Legislature and as described to the Seventh Circuit, the IDPP is designed to help the limited class of eligible voters who have allegedly "f[ound] it difficult to assemble the required documentation" and "face[d] 'somewhat heavier' burdens" in securing identification under the IDPP than other eligible voters. *Luft*, 963 F.3d at 679 (quoting *Crawford*, 553 U.S. at 199 (controlling op. of Stevens, J.)); *see also Frank III*, 835 F.3d at 651 (under current IDPP, "[n]o one must present documents, that, for some, have proved challenging to acquire; no one must show a birth certificate, proof of citizenship, and the like"); *Frank II*, 819 F.3d at 385-86 (listing three classes of voters with difficulty assembling documents).

In sum, as the Seventh Circuit recognized, the process described above requires no more than a single trip to the DMV and "cooperat[ion] with a request for information that is either readily available *or obtainable with reasonable effort*." *Luft*, 963 F.3d at 680 (emphasis added). The Seventh Circuit held in *Frank I* that—for the vast majority of voters—"if photo ID is available to people willing to scrounge up a birth certificate and stand in line at the office that issues drivers' licenses, then all we know from the fact that a particular person lacks a photo ID is that he was unwilling to invest the necessary time." *Frank v. Walker*, 768 F.3d 744, 748 (7th Cir. 2014) (*Frank I*) (citing *Crawford*, 553 U.S. at 198 (controlling op. of Stevens, J.)). Under the current version of the IDPP, an applicant is not even required to do as much as "scrounge up a birth certificate" because, as described above, the State

shoulders the burden to investigate identity-confirming documentation. Wis. Stat. § 343.165(8)(b)2-3.

Not only is the IDPP as the State described it, but the State has *improved* its implementation of the IDPP: "Based on its experiences administering the IDPP, DMV has made many process improvements in the last few years." September Boardman Decl. ¶ 16; *see id.* at ¶¶ 17-26 (detailing specific improvements to IDPP's implementation).

## B. The Current IDPP Has Been "Reliably Implemented," So All Eligible Voters Can Obtain ID With Reasonable Effort.

All that remains, therefore, are claims that the DMV has not "*reliably implemented*" the current IDPP, which potentially implicates only a limited set of eligible voters.

1. By this point in the litigation, the dispute has narrowed to a small fraction of the State's potentially eligible voters.[3] Most pertinently, only 381 individuals (of the more than 10,000 people) who initiated the current IDPP have

---

[3] When this Court in 2016 last considered the IDPP, it found that over 95% of the State's registered voters already had qualifying ID. *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 918 (W.D. Wis. 2016); Wis. Stat. § 5.02(6m)(a)-(g) (listing acceptable forms of ID). For the few remaining eligible voters who do not already have sufficient identification, the State provides free voter IDs through the IDPP. *See* Wis. Stat. §§ 343.165(8), 343.50(1)(c). And even for this small percentage of eligible voters, "most of those who seek free IDs are probably voters who have the documents necessary to get a qualifying ID." *One Wisconsin Inst.*, 198 F. Supp. 3d at 918. The "necessary" documents include a broad range of documents that allow applicants to prove their name, date of birth, and citizenship status. Wis. Stat. § 343.165(8)(b)4.a-m (proof of citizenship); *id.* § 343.165(8)(b)5.a-h (proof of identity); § 343.165(8)(b)6.a-o (proof of name and date of birth). The State's voter ID laws are indisputably constitutional for all those voters already possessing sufficient ID or necessary documents.

needed to progress to the State's additional-documentation investigative phase—which is the process the State designed to help applicants who lacked the requisite documents to secure valid voter ID. September Boardman Decl. ¶ 9. These individuals were automatically given temporary voter IDs as soon as they initiated the IDPP. Wis. Stat. § 343.50(1)(c)1. And some of these 381 individuals lack even cognizable claims, as defendants presented evidence that the State has granted IDs to people who reach this phase. September Boardman Decl. ¶¶ 31-32.[4]

Some subset of these 381 individuals *might* have plausible *Anderson/Burdick* claims about the implementation of the current IDPP in their precise circumstances. But even that as-applied analysis will depend on what documentation was "obtainable with reasonable effort," given the particular circumstances of those specific individuals. *Luft*, 963 F.3d at 680. Additionally, viable *Anderson/Burdick* claims might exist in those few other extraordinary outlier circumstances in which individuals could have been denied permanent ID at other points in the IDPP after they gave up on the process due to unreasonable state agency delay—delay that itself would have violated the statutory requirement that state agency investigations be "prompt." Wis. Stat. § 343.165(8)(b)3.

Furthermore, to prevail on *Anderson/Burdick* claims, those individuals would still need to prove to this Court that they are, in fact, eligible voters. The Seventh

---

[4] To be sure, there might be isolated cases in which eligible applicants who did not make it to this extraordinary proof phase were nevertheless denied a permanent ID. Plaintiffs must prove such applicants exist. And in all events, such outlier cases are due to failure of implementation, not a failure of design.

Circuit's *Frank* decisions confirm that any potential constitutional deficiencies in the IDPP are limited to individuals who prove that they are *eligible* voters who are unable to secure voter ID with reasonable effort: "The constitutional question under *Frank II* is whether the state ensures that every *eligible* voter can get a qualifying photo ID with reasonable effort." *Luft*, 963 F.3d at 679 (emphasis added); *see Frank III*, 835 F.3d at 651 ("[T]he state may not frustrate this right for any *eligible* person by making it unreasonably difficult to obtain a qualifying photo ID.") (emphasis added); *Frank II*, 819 F.3d at 386 ("Plaintiffs' approach is potentially sound if even a single person *eligible* to vote is unable to get acceptable photo ID with reasonable effort.") (emphasis added); *see also id.* at 385-86 (same); *Frank I*, 768 F.3d at 748-49 (discussing eligible voters who possess ID).

In short, the only possibly remaining challenges therefore would concern the alleged tiny fraction of (1) *eligible* voters; (2) who currently lack sufficient ID; and (3) have not obtained and could not "obtain[] with reasonable effort," *Luft*, 963 F.3d at 680, *any* "documentation deemed acceptable to the department of transportation," Wis. Stat. § 343.165(8)(b)3g.h "or other corroborating information," *id.* § 343.165(8)(h), necessary to get a free voter ID; (4) when the State also cannot find any such documentation or information in its own statutorily required investigation and (5) then does not provide a permanent ID despite it being "more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct," *id.*; *id.* § 343.165(8)(b)3g.

**2.** At the beginning of the IDPP, the State *automatically* issues a temporary credential valid for voting to anyone who simply initiates the IDPP—regardless of what documentation they possess (or lack) at the onset of the process.[5] *See id.* § 343.50(1)(c)1; *Luft*, 963 F.3d at 679 ("on receipt of designated materials, the state issues a credential as a matter of course"); *Frank III*, 835 F.3d at 651 ("No one must present documents, that, for some, have proved challenging to acquire; no one must show a birth certificate, proof of citizenship, and the like.").

Consequently, an applicant who initiates the process with *no supporting documentation at all* is still afforded a valid voting ID that automatically and perpetually renews while the IDPP application is pending. *See* Wis. Stat. § 343.50(1)(c)2; Dkt. No. 351, August 10, 2020 Declaration of Kristina Boardman ¶ 6 (August Boardman Decl.) ("Anyone who fills out an MV3012 form is entered into the IDPP and receives a receipt that is valid for voting. This is true even if the IDPP application is incomplete. For example, if an application is not accompanied by proof of identity, it is still processed, and the applicant gets an ID receipt which is valid for voting. . . . The application remains incomplete but is not rejected or cancelled.").

"Accordingly, all it takes to get a voting-compliant ID is for an applicant to go to the DMV and fill out the required application forms as best they can and with any information they have available." September Boardman Decl. ¶ 8.

---

[5] IDPP applicants can easily initiate the process—and invoke the State's "presumption of eligibility," *Luft*, 963 F.3d at 679—by filling out a one-page form with basic information like name, date of birth, citizenship, and contact information and certify that the applicant is a Wisconsin resident. *See* Dkt. No. 401-7, Form MV3012: DMV Administrator Petition – Unavailable Documentation.

**3.** The State's generous IDPP continues for *permanent* IDs too. Once the IDPP has been initiated, *state agency officials* assume the burden of investigating and verifying relevant information about applicants' voting eligibility. *Luft*, 963 F.3d at 679 (citing Wis. Stat. § 343.50(1)(c); Wis. Admin. Code § Trans 102.15(6m)). So the amount of time that it might take state agency officials to investigate an application does not burden eligible voters' right to vote, as they will have a sufficient temporary voter ID during that investigation. The DMV *must* grant an IDPP application and provide a permanent free voter ID if "it is more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct." Wis. Stat. § 343.165(8)(h).

The DMV begins its investigation by transmitting the birth details from completed IDPP applications to the Wisconsin Vital Records Office (part of the Department of Health Services) so that the Vital Records Office can verify the information with the applicant's State of birth. If the information matches, the process is complete and applicants receive a permanent ID card valid for eight years. *Id.* § 343.165(8)(b)2.

More than one-third of all IDPP applications were resolved through this initial birth-records check: "[O]f the 10,046 IDPP applications received between November 1, 2016 and July 31, 2020, 3,415 (34%) were quickly verified by DHS [Department of Health Services] without any additional follow-up by the applicant." September Boardman Decl. ¶ 9.

In the remaining cases where this initial birth-detail records analysis by DMV cannot quickly confirm the information in the IDPP application, the State nevertheless continues its efforts to investigate the applicant's eligibility through whatever documentation it can find. DMV "employees whose regular job duties include investigation and fraud detection and prevention"—which, under DMV practice, are employees in the Compliance, Audit and Fraud Unit (CAFU)—are then required to investigate the application. Wis. Stat. § 343.165(8)(b)3.

Only about 10% of all IDPP applications reach this CAFU investigation phase,[6] and nearly two-thirds of those quickly result in permanent IDs: "[O]f the 10,046 IDPP applications received between November 1, 2016 and July 31, 2020 . . . 1005 reached CAFU but the majority (624 applications or 62%) were then quickly issued upon re-submission to DHS. Only 381 applications (3.8%) required the extraordinary proof process." September Boardman Decl. ¶ 9.

Importantly, acceptable "secondary documentation" for these few voters reaching the CAFU extraordinary-proof stage includes a broad range of enumerated documents. Wis. Stat. § 343.165(8)(b)3g. The "extraordinary" aspect of this proof, therefore, does not impose a heightened burden on applicants, but instead shows that

---

[6] The remaining applications did not result in permanent IDs for indisputably legitimate reasons: (1) cancellation by applicants (3,798 applications); (2) applicants moving out of state (163 applications); and (3) fraud or ineligibility (29 applications). *See* September Boardman Decl. ¶ 10. "861 applications have been denied and 775 remain in a pending or suspended status, and *the applicant continues to receive receipts valid for voting*." *Id.* (emphasis added). Plus, the most recent statistics further demonstrate that from January 2020 through July 2020, no petitions have been denied for non-contact, with two cancelled for detected fraud. August Boardman Decl. ¶ 31.

the state agency officials take significant steps to investigate and accept all sorts of documentation proving an individual's identity.

State agency officials can also resolve problems like minor inaccuracies in birthdate information or small discrepancies in the spelling of names: "[T]he department may issue an identification card bearing a name other than the name that appears on a supporting document if the person provides evidence acceptable to the department that the person has used the name in a manner that qualifies the name as being legally changed under the common law of Wisconsin[.]" *Id.* § 343.50(3)(c)1. As the Seventh Circuit and this Court have both recognized, this cures one of the prominent alleged problems with the previous IDPP for voters whose "name . . . differs from that of [their] birth certificate[s] in spelling." *Luft*, 963 F.3d 680; *id.* (the "new petition process requires the officials to accept a name change when an applicant submits a statement declaring the common-law elements as well as the prior name and its discontinuance") (citing Wis. Stat. § 343.50(3)(c); Wis. Admin. Reg. CR 16-040 §§ 1-3); Dkt. No. 366 at 32:19-22 (The Court: "It seems to me that the common law name change process takes care of the problems of the sort that Mr. Randle encountered.").[7] And while CAFU corrects these issues, "the Department may not deny issuance of an identification card receipt due to a name or date of birth

---

[7] This provision would have specifically addressed problems alleged in the operative pleadings. Dkt. No. 141 ¶¶ 18-19; *Luft* Dkt. No. 31 ¶¶ 4, 7, 9; *Luft* Dkt. No. 303 ¶ 2. *Cf. Frank II*, 819 F.3d at 386 (identifying the class of "eligible voters unable to obtain acceptable photo ID with reasonable expense and effort because of name mismatches or other errors in birth certificates or other necessary documents").

mismatch, spelling error or other typographical error on a supporting document[.]"
Wis. Admin. Code § Trans. 102.15(6m)(a)(Note).

To be sure, CAFU's investigations may (permissibly) require the applicants to "cooperate with a request for information that is either readily available *or obtainable with reasonable effort.*" *Luft*, 963 F.3d at 680 (emphasis added). And this happens in only a fraction of the IDPP applications:

> For example, in the approximately 20% of cases where followup may be needed, CAFU may call an applicant and ask where they were born, which can be a critical question for establishing U.S. citizenship. The applicant is required to respond to this reasonable request for information. CAFU will then use the information supplied by the applicant to verify U.S. citizenship. *During the time of CAFU's investigation, the applicant need not do anything to continue getting a renewed ID document in the mail, even if the time period between CAFU contacts exceeds the 60-day term of the document.* A new receipt will simply be automatically mailed to the applicant.

September Boardman Decl. ¶ 13 (emphasis added).

In analyzing whether the IDPP was reliably implemented, this Court cannot assume that applicants have made a "reasonable effort" to obtain sufficient documentation just because they have *initiated* the IDPP. *Luft*, 963 F.3d at 680 ("Our decisions in *Frank I* and *Frank II* do not permit applicants to stop the verification process unilaterally."). The Seventh Circuit held that the State may constitutionally structure the IDPP to require applicants "to comply with reasonable requests for information that [are] material to voting eligibility," and an applicant cannot "stop the verification process unilaterally" by declining to comply with such requests. *Id.* Regardless, the State has taken additional efforts to minimize the burdens of responding to information requests. *See, e.g.*, September Boardman Decl. ¶ 20 ("DMV

now accepts documents by email and photograph.") And throughout the process, the State continues to conduct its own investigation for facts in support of the application.

After all this process, even if "extraordinary proof does not establish a person's identity, DMV has found that the information on an application was more likely than not correct and issued a hard card" permanent voting ID—confirming that the State generously provides IDs under the current IDPP. September Boardman Decl. ¶ 32. *Cf. Frank II*, 819 F.3d at 386 (identifying the classes of "eligible voters who need a credential from some other agency (such as the Social Security Administration) that will not issue the credential unless Wisconsin's Department of Motor Vehicles first issues a photo ID, which the DMV won't do until the other credential has been obtained; and [] eligible voters who need a document that no longer exists (such as a birth certificate issued by an agency whose records have been lost in a fire)").[8]

**4.** Accordingly, the plaintiffs are not entitled to a declaration that the IDPP "continues to violate the First and Fourteenth Amendments to the United States Constitution." Dkt. No. 390 ¶ 1 (*One Wisconsin Institute* plaintiffs' motion for preliminary injunction).

The revised IDPP addresses the alleged structural deficiencies that troubled this Court back in 2016. The temporary IDs that the State issues to each IDPP applicant automatically renew, alleviating this Court's concern about the prior IDPP's temporary identification expiring on a date certain. *Cf. One Wisconsin Inst.,*

---

[8] The combination of these generous provisions cures many of the defects alleged in the operative complaints. *Luft* Dkt. No. 31 ¶¶ 5, 6 ,8, 11, 14; *Luft* Dkt. No. 303 ¶ 4.

*Inc. v. Thomsen*, 198 F. Supp. 3d 896, 916 (W.D. Wis. 2016) ("The state has promised to renew the receipts for 180 days . . . . But the state has been utterly silent on what happens after that. As things stand now, after these receipts expire, petitioners will once again find themselves in IDPP limbo."). Simply by applying, applicants secure valid ID for at least seven months, as long as the State does not conclude they are ineligible—and this seven months will extend even further if the applicant just responds to communication from the State, as the Seventh Circuit held is permissible. *Luft*, 963 F.3d at 681; September Boardman Decl. ¶ 11 (listing cancellation, a finding of ineligibility, and a failure to respond to the State as the "only three ways that a person who fills out an IDPP application will no longer automatically receive renewed IDs by mail"); *id.* ¶ 15 ("Thus, a person who fills out a petition at a DMV center will have a voting-qualifying ID sent to them for seven months, even if he or she completely refuses to cooperate with requests for information or even refuses to answer the phone when DMV calls."). Though these IDs are temporary (in that they expire and then automatically and immediately renew), they ensure that IDPP applicants have sufficient voter ID.

For those voters for whom "extraordinary proof does not establish a person's identity, DMV has found that the information on an application was more likely than not correct and issued a hard card" permanent voting ID in cases warranting this treatment. September Boardman Decl. ¶ 32. This addresses the Court's concern about "unquestionably" "qualified" voters who do not have the documents necessary to secure a permanent ID. *One Wisconsin Inst., Inc. v. Thomsen*, No. 15-CV-324-JDP,

2016 WL 4250508, at *3 (W.D. Wis. Aug. 11, 2016). The fact that such a voter might have to "cooperate with a request for information that is either readily available *or obtainable with reasonable effort*," is not unconstitutional under *Luft*. 963 F.3d at 680 (emphasis added). *Cf. One Wisconsin Inst.*, 2016 WL 4250508, at *3 ("[H]er receipt would be subject to cancellation once 180 days pass without her providing some new information to the DMV."). And the "state's procedure gives each person claiming eligibility to vote a rebuttable presumption of eligibility." *Luft*, 963 F.3d at 679 (emphasis added). The current IDPP as codified in state statutes by the Legislature therefore does not place the burden on applicants "to convince the DMV to exercise its discretion to issue them IDs." *One Wisconsin Inst.*, 198 F. Supp. 3d at 916.

The State has also engaged in outreach about the IDPP, which has existed in its current form for over four years. *See* Dkt. No. 400 (Declaration of Megan Wolfe); Defs. Br. at 26-34. *Cf. One Wisconsin Inst.*, 198 F. Supp. 3d at 963 (detailing public outreach requirement of injunction).

Finally, many of plaintiffs' remaining assertions are targeted at implementation of the IDPP itself in particular applicants' circumstances—which cannot support a remedy restructuring the IDPP. For example: (1) reliance on interactions with other agencies; (2) a rough equivalence between voter ID and driver's license standards; (3) matches with Social Security records; (4) some level of administrative discretion, inherent in all agencies; (5) matching birthdates; (6) use of CLEAR background investigations; and (7) failure to apply the "more likely than not" standard using all "corroborating information."

## II. Any Possible Remedy Should Be Limited To The Particular Circumstances Of Individual Plaintiffs, And Many Of Plaintiffs' Requests For Relief Exceed The Seventh Circuit's Mandate.

### A. The Seventh Circuit's *Frank II* And *Luft* Opinions Foreclose Anything More Than Individualized Relief.

Under the Seventh Circuit's decision in *Frank II*, plaintiffs could only possibly obtain individualized relief tailored to the precise burdens faced by relatively few individuals identified above: "[T]he burden some voters faced [cannot] prevent the state from applying the law generally." *Frank II*, 819 F.3d at 386. Under the analysis set forth in *Luft*, furthermore, once the State can prove that the IDPP is as-described to the Seventh Circuit, then all that possibly remains are individual instances in which the IDPP has not been "*reliably implemented.*" *Luft*, 963 F.3d at 679. To cure any such defects, this Court cannot "order any relief that excuses applicants from the failure to comply with reasonable requests for information that is material to voting eligibility," and likewise cannot fundamentally reform the IDPP by "[p]ermitting voters to file affidavits to obtain voting credentials." *Id.* at 679-80. Applicants cannot be permitted to "convert a rebuttable presumption of eligibility into an absolute entitlement just by declining to cooperate with a request for information that is either readily available or obtainable with reasonable effort." *Id.* at 680.

As demonstrated above, the only possible IDPP applicants with cognizable *Anderson/Burdick* claims are those (1) who are eligible voters; (2) who lack qualifying ID; (3) who cannot produce *any* "documentation deemed acceptable" to the DMV, Wis. Stat. § 343.165(8)(b)3g, that would be "obtainable with reasonable effort," *Luft*, 963 F.3d at 680; (4) for whom the State, likewise, could not find *any* acceptable

documentation "or other corroborating information," Wis. Stat. § 343.165(8)(h); and (5) state agency officials did not otherwise issue a permanent ID notwithstanding the fact that it is "more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct," *id.*; *see* September Boardman Decl. ¶ 32 ("In cases where even extraordinary proof does not establish a person's identity, DMV has found that the information on an application was more likely than not correct and issued a hard card.").

Any relief must be tailored to the unique circumstances of those individuals and the DMV's implementation of the IDPP as applied to their unique circumstances. Thus, this case cannot entail "fundamental reform[]" of the IDPP, as requested by plaintiffs because any potential problem is not with the IDPP's design and structure but with its implementation in specific cases. Dkt. No. 390 ¶ 3. Broader relief would abrogate the valid structure of the IDPP. And that result could require the State to sacrifice its "interest in the 'integrity and reliability of the electoral process,'" *Luft*, 963 F.3d at 680 (citations omitted)—by providing permanent voter ID to those who have not proved themselves to be eligible voters, or have not even confirmed their most basic information, *see Frank I*, 768 F.3d at 750 ("[T]he need for documentation such as a birth certificate to get a photo ID suggests another benefit: it will prevent some people who should not have registered (because they are too young or not citizens) from voting when they are unable to get a qualifying photo ID.").

Concerns about fraud are not merely theoretical. The evidence submitted by defendants illustrates that the IDPP's procedures—as the State described them to

the Seventh Circuit—have helped the State "identif[y], and cancel[], applications by people seeking an ID as a second identity or people who are not U.S. Citizens." September Boardman Decl. ¶ 33; *see also* Defs. Br. at 20-22.

If there are any individual plaintiffs who can demonstrate that they are, in fact, eligible voters who have nevertheless been unconstitutionally denied permanent identification under the IDPP, the remedy must be tailored to providing those specific plaintiffs ID sufficient to vote. As the *One Wisconsin Institute* plaintiffs' survey of applicants aptly demonstrates, the investigation process of the IDPP will necessarily vary by applicant, each of whom will have different documents or information "readily available or obtainable with reasonable effort" and will have different experiences with their personalized investigation. *Luft*, 963 F.3d at 680. Any denial—or alleged delay in issuing permanent ID—will therefore depend on the specific circumstances of those disparate investigations. Any such denials are fact-bound and unique, and they defy resolution by broad remedies restructuring the IDPP.

Moreover, under the IDPP as enacted by the Legislature, the DMV "*shall grant a petition if the department concludes, on the basis of secondary documentation*"—including through *any* "documentation deemed acceptable to the department of transportation," Wis. Stat. § 343.165(8)(b)3g—"or *other corroborating information*, that it is more likely than not that the [information] provided in the application is correct." *Id.* § 343.165(8)(h) (emphases added). Plaintiffs do not contend that this "more likely than not" statutory evidentiary standard based on a broad range of information is constitutionally suspect—nor could they, as the Seventh Circuit has

already approved it. *Luft*, 963 F.3d at 679-80. Indeed, this evidentiary standard accounts for certain alleged flaws the Seventh Circuit identified for those with difficulty producing certain documentation. *Frank II*, 819 F.3d at 386.

Rather, plaintiffs contend that, as implemented in *some limited* number of cases, DMV officials effectively hold applicants to a higher standard of proof. That is actually an allegation that the DMV is denying IDs based on *violations of* state law, not *because of* state law. The remedy for any such denials is not to rewrite the State's otherwise legitimate IDPP statutes—which permissibly compel the DMV to issue permanent IDs based on a "more likely than not" standard—but to afford individualized relief based on state agency officials' implementation of the IDPP in specific cases.

This Court may order state officials to follow the "ready-made body of rules, regulations and procedures" of state statutory law where officials' failure to follow state law gives rise to federal constitutional injury. *Komyatti*, 96 F.3d at 960. Here, that would cure any possible allegations regarding (1) investigations that are not "prompt," Wis. Stat. § 343.165(8)(b)3; (2) state officials not faithfully applying the "more likely than not" standard, *id.* § 343.165(8)(h); and (3) state officials' failure to consider "other corroborating information," *id*. As the Seventh Circuit has clarified:

> Articulating a standard of conduct in terms of compliance with a state statute will often better serve the concerns of federalism than the formulation of a standard that is purely the product of the federal court. State statutory law provides a convenient, ready-made body of rules, regulations and procedures that may, in a proper case, provide an appropriate remedy to the federal constitutional violation alleged in the underlying complaint.

*Komyatti*, 96 F.3d at 960.

In fact, this Court could not impose a programmatic remedy more generous than the IDPP as codified by the Legislature—without requiring the State to offer permanent IDs to ineligible voters or people for whom neither this Court nor the State has confirmed vital information based on a "more likely than not" standard. The IDPP already (1) ensures that *every* applicant receives temporary identification "as a matter of course," which may only be withdrawn after a finding of ineligibility, *Luft*, 963 F.3d at 679; (2) allows applicants to prove their eligibility for permanent IDs through any "documentation deemed acceptable to the department of transportation," Wis. Stat. § 343.165(8)(b)3g; (3) requires the State to "investigate the petition and any additional information provided under this subdivision with prompt and due diligence and [] use reasonable efforts to locate and obtain the secondary documentation by pursuing leads provided by the person," *id.* § 343.165(8)(b)3; and (4) ultimately grants any application if "it is more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct," *id.* § 343.165(8)(h).[9]

_____

[9] The highly individualized, applicant-specific nature of the alleged deficiencies in the IDPP also demonstrates that the *Luft* class does not satisfy the "commonality" requirement of Federal Rule of Civil Procedure 23—and therefore the years-old certification of that class cannot support programmatic changes to the IDPP. *See Luft* Dkt. No. 294 at 7 ("I will define the proposed class as all those eligible to vote in Wisconsin who cannot with reasonable effort obtain a qualifying photo ID."). A "favorable class determination by the court is not cast in stone. If the certification of the class is later deemed to be improvident, the court may decertify[.]" *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 896 (7th Cir. 1981) (citation omitted).

Plaintiffs must raise a "common contention" that "is capable of *classwide resolution.*" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis

### B. Many Of Plaintiffs' Requests For Relief Are Outside The Scope Of The Seventh Circuit's Limited Remand.

Much of the relief that plaintiffs have requested from this Court is foreclosed by the Seventh Circuit's decision in *Luft*.

1. ***Luft* Plaintiffs.** The *Luft* plaintiffs' requests for transformative relief exceed the scope of the Seventh Circuit's narrow remand and, in some places, are specifically barred by *Luft*'s express discussion of improper remedies.

*First*, the *Luft* plaintiffs' requests for structural reforms to the IDPP are barred by the Seventh Circuit's holding that the IDPP has a valid structural design if it as-described in the State's briefing to the Seventh Circuit. Plaintiffs make various requests to alter the IDPP beyond how the State described it to the Seventh Circuit:

- **Request 1:** Issue a voter ID card that is valid for 8 years ("Hard Card") to any voter who has (i) had their name, date of birth, and social security number verified through the Social Security Online Verification System ("SSOLV"); (ii) submitted proof of Wisconsin residency; and (iii) sworn under penalty of perjury that they are a U.S. citizen.
- **Request 2:** Issue a Hard Card by the time the initial Temporary Receipt expires to any voter who has complied with *reasonable* requests for information, unless the DMV has a genuine reason to suspect that the voter is ineligible. The absence of documentation does not itself constitute such a reason.
- **Request 3:** Permit voters to use affidavits—akin to the common law name change affidavit—to resolve other issues in a voter's background documents (e.g., birth date discrepancies, mismatches between current name and name in voter's SSA record, and missing information regarding birth details) unless the DMV has a genuine reason to suspect that the voter is ineligible. The absence of documentation does not itself constitute such a reason.

added). Accordingly, even if plaintiffs can raise "common 'questions'" about the IDPP, their claims are not capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Rather, any "flaws" with the IDPP are limited to flaws in dissimilar, individualized investigations, and such flaws defy programmatic or class-wide remedies.

- **Request 4:** Inquire whether a voter knows of any potential name discrepancy issues at the time the IDPP application is submitted, and to permit voters to use a common law name change affidavit at that time.
- **Request 5:** Establish a process that provides notice and a hearing before a neutral decision maker to voters denied Temporary Receipts or Hard Cards by the DMV due to (1) claims of ineligibility, fraud, or any other reason or (2) the DMV's failure to resolve their IDPP petition within 180 days.
- **Request 9:** Amend the Form MV3012, the Temporary Receipt, the Takeaway Document, and the Palm Card related to IDPP to conspicuously explain: (i) that a voter must remain in contact with DMV for a specified time to continue receiving Temporary Receipts, (ii) that if the voter loses contact and the petition is cancelled or denied the voter may reinstate the petition and receive a Temporary Receipt by contacting DMV and (iii) that the voter has rights to a hearing, as noted above.

Dkt. No. 397 ¶¶ 1-5, 9.

Many of these requests are beyond the scope of the Seventh Circuit's remand because they have no basis in law. Request 1, for example, would replace the State's preference for certain forms of documentation with the plaintiffs' preference for the SSOLV report and a sworn statement regarding the applicant's citizenship. But the State's determination that IDs automatically issue only based on specific documentation has been approved by the Seventh Circuit. *Luft*, 963 F.3d at 679. Regardless, state statutes already require the DMV to grant permanent IDs when the information it possesses makes it "more likely than not that the name, date of birth, and U.S. citizenship provided in the application is correct." Wis. Stat. § 343.165(8)(h). SSOLV verification is, of course, one piece of "corroborating information" that the DMV would need to consider. *Id.*

Request 2 inverts the burden to require the State to disprove an applicant's eligibility, when—to successfully state an *Anderson/Burdick* claim—individuals must first demonstrate that they are, in fact, eligible voters and have the right to vote.

*Frank II*, 819 F.3d at 386 (limiting any potential claims to eligible voters). A remedy that inverts this burden therefore goes far beyond remedying actual *Anderson/Burdick* violations. Plus, Request 2 seeks to place a time limit on how long the State's investigation can take, which the Seventh Circuit did not recognize as even a *potential* defect, especially considering that each applicant receives temporary ID valid for the entire period of investigation.

Request 4 seeks to reconfigure when applicants can submit an affidavit to change their names—even though the current IDPP allows voters to submit such affidavits at the same point in the process as described to, and approved by, the Seventh Circuit. *Luft*, 963 F.3d at 679, 680. Even assuming plaintiffs' Request 4 resulted in applicants receiving their permanent IDs sooner, applicants suffer no injury from the process of waiting slightly longer for their permanent IDs because they have temporary IDs.

Request 5 seeks to heap substantial additional process into the IDPP, when the Seventh Circuit's *Luft* opinion said nothing about any such process. Instead, the Seventh Circuit said that the current IDPP's general structure was valid if it is "as described by the State" on appeal. *Id.* at 679.

Request 9 is programmatic relief that exceeds the Seventh Circuit's limitation to individual-level remedies. And it incorporates a reference to plaintiffs' request to add an entirely new administrative hearing step to the structurally valid IDPP.

*Second*, this court cannot "[p]ermit[] voters to file affidavits to obtain voting credentials." *Luft*, 963 F.3d at 679. Yet plaintiffs ask this Court to replace various

components of the IDPP with affidavit options: Request 1 would allow applicants to use an affidavit to secure ID without proving their citizenship; and Request 3 would allow applicants to use affidavits in lieu of actual evidence substantiating their application, including to make up for "missing information regarding birth details." Dkt. No. 397 ¶¶ 1, 3. These affidavit options circumvent the IDPP in a materially identical manner to the affidavit option the Seventh Circuit stayed and rejected from the *Luft* district court. *See Luft*, 963 F.3d 669 (affidavit option that "excuses the requirement for photo ID" while voting). Whether the injunction is designed to excuse the lack of ID (as in *Luft*) or the *lack of sufficient documentation* needed to get an ID (here) does not matter under *Luft*. The Seventh Circuit made clear that courts cannot order that State to accept "affidavits to *obtain voting credentials*." *Id.* at 679 (emphasis added).

*Third*, nothing in *Luft* calls for the State to engage in more advertisement or outreach about the IDPP:[10]

- **Request 6:** Send a targeted mailing no later than October 6, 2020, to all registered voters without a Wisconsin driver's license or ID informing them of the ID requirement and the IDPP system.
- **Request 7:** Include the following language: "Need an ID for voting? Through the DMV's ID petition process, you can get a free ID even if you don't have documents like a birth certificate" on (i) any future mailing or

___

[10] To be sure, the Seventh Circuit denied initial en banc treatment in *Frank III*, and mentioned that "our conclusion [not to grant initial en banc consideration] depends also on the State's compliance with the district court's second criterion, namely, that the State adequately inform the general public that those who enter the IDPP will promptly receive a credential for voting, unless it is plain that they are not qualified." *Frank III*, 835 F.3d at 652. This was not a constitutional observation, but rather a prudential one—made before four years of the State's further advertisement and outreach about the IDPP. If the Seventh Circuit intended this to be a component of its limited remand, it easily could have said so in *Luft*.

publication that mentions the voter ID requirement, (ii) all relevant websites that mention the voter ID requirement, and (iii) all DMV and/or WEC hotlines.

- **Request 8:** Ensure that IDPP information (such as the Palm Card) is posted at all municipal clerk's offices, on all municipal clerk's websites, and at all early voting sites and polling places, and is provided along with provisional ballot instructions to any voter who is offered a provisional ballot.

- **Request 10:** Comply with [] elements of the IDPP information plan that the Court ordered in October 2016[.[11]]

Dkt. No. 397 ¶¶ 6-8, 10. Moreover, there is no basis in the *Anderson/Burdick* doctrine for the proposition that an otherwise valid program to provide eligible voters with free voter ID is unconstitutional because of the State's outreach efforts.

In all events, defendants have provided evidence that they have engaged in persistent and pervasive outreach to potential eligible voters about the current IDPP, which has been in effect for material purposes for multiple years. *See generally* Declaration of Megan Wolfe; Defs. Br. at 26-34.

---

[11] Including: "a) Offer the Palm Card—in digital and printed format and in Spanish and English—to all organizations identified in the October 21, 2016 Joint Status Report, to organizations identified in footnote 21 of the *Luft* Plaintiffs' Brief in Support of the Motion for Preliminary Injunction, to state public assistance agencies, and to state agencies serving low income and homeless persons; b) Personally contact and offer to meet, train, and discuss outreach and IDPP with all organizations identified in the preceding paragraph, as well as organizations identified in the Joint Status Report of October 21, 2016, no later than the week of October 12, 2020; c) Ensure that both Spanish and English versions of the Palm Card are conspicuously posted in all DMV offices and on any DMV web page related to ID and IDPP, and that a copy of the Palm Card is given to any voter seeking an ID card at a DMV office; and d) Comply with all elements of the IDPP information plan WEC has already established for this fall, and ensure that IDPP information provided as any part of media availability or outreach is also offered to media serving minority communities." Dkt. No. 397 ¶ 10

### 2.    *One Wisconsin Institute* Plaintiffs.

**First Request for Relief.** As addressed above at pp.19-21, the *One Wisconsin Institute* plaintiffs' request for relief declaring the IDPP unconstitutional is meritless—even though some of those claims may fall within the scope of claims not categorically barred by the Seventh Circuit's *Luft* limited remand and mandate.

**Second Request for Relief.** Plaintiffs' second request for relief is threefold. First, plaintiffs request more outreach and public education. This request extends beyond *Luft*'s remand, as addressed above.

Second, plaintiffs propose various measures ranging from outreach efforts to those IDPP applicants with potentially expiring (and automatically renewing) temporary IDs, to a wholesale request that election officials accept expired temporary IDs. Though premised as intermediate reforms in the lead up to the November 3 election, many are structural reforms that subvert the IDPP as described to the Seventh Circuit:

- **Outreach Efforts to Tell People Temporary IDs May Expire:** As the IDPP as approved by the Seventh Circuit does not require any outreach to those with potentially expiring IDs (as the IDs automatically renew), this request is beyond the scope of the remand. *Luft*, 963 F.3d at 679.
- **Issuing Renewed IDs to Anyone who Asks:** Again, temporary IDs under the IDPP automatically renew every 60 days, and the Seventh Circuit approved of that interval. *Id.*
- **Election Officials Accepting Expired Temporary IDs:** As stated above, the Seventh Circuit approved of the IDPP issuing renewed temporary IDs every 60 days and thus necessary approved of the State deeming *expired* IDs invalid for voting. *Id.*
- **Provisional Ballots for Voters Who Sign An Affidavit That They Have not Received or Have Lost a Temporary ID:** This is akin to the "affidavit" option that the Seventh Circuit rejected. *Id.* at 680. *Luft* held that the State may permissibly ask for qualifying ID before voters cast their ballots.

- **DMV Must Complete An Inventory of Pending Applications and Produce a Report About Why Each Person Has Not Secured a Permanent ID:** Such a report is not called for by the IDPP as explained to the Seventh Circuit.

Third, plaintiffs request this Court maintain supervisory jurisdiction and impose reporting requirements. There is no basis for the Court to do so when addressing the remaining limited, as-applied claims about particular individuals' circumstances. Facial relief here is foreclosed, so there is no colorable basis for anything like supervisory jurisdiction or reporting requirements. The Seventh Circuit remanded for this Court to consider the implementation of the IDPP on a new record and issue targeted relief where necessary. Supervisory jurisdiction and reporting requirements are far beyond that limited mandate.

**Third Request for Relief.** Regarding plaintiffs' third request for relief, the Seventh Circuit's remand does not permit "fundamental reforms of the IDPP," whether "supplemented by the additional proposals of *One Wisconsin* and *Luft* plaintiffs in the[ir] briefs" or otherwise. Dkt. No. 390 ¶ 3. The Seventh Circuit's *Luft* decision made clear that the overall design of the IDPP—if the IDPP is as described to the court—is constitutional. *See Luft*, 963 F.3d at 679.

III. **This Court Should Resolve These Dispositive Motions By September 28, 2020—To Allow For Any Possible Appellate Stay Proceedings Before The October 1 Deadline For Changing The IDPP.**

Wisconsin's October 1, 2020 deadline to implement any changes to the IDPP is rapidly approaching. To provide ample time to implement or possibly challenge any order from this Court, the Court should issue its order as soon as possible after the September 25 hearing. The Legislature respectfully requests that this Court resolve

these dispositive motions by September 28 to provide some time for possible appellate stay proceedings, should they be needed, before the October 1 deadline.

## CONCLUSION

This Court should deny plaintiffs' preliminary-injunction motions and grant defendants' summary-judgment motion.

Respectfully submitted,

/s/ *Scott A. Keller*
Scott A. Keller
  *Counsel of Record*
BAKER BOTTS LLP
700 K Street, N.W.
Washington, DC 20001
(202) 639-7837
(202) 585-1023 (fax)
scott.keller@bakerbotts.com

Eric M. McLeod (State Bar No. 1021730)
Lane E. Ruhland (State Bar No. 1092930)
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
(608) 255-4440
(608) 258-7138 (fax)
eric.mcleod@huschblackwell.com
lane.ruhland@huschblackwell.com

*Attorneys for the Wisconsin Legislature*