# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

ONE WISCONSIN INSTITUTE, INC.,
et al.,

       Plaintiffs,

      v.                     Case No. 15-CV-324

MARK L. THOMSEN, et al.,

       Defendants.

---

JUSTIN LUFT, et al.,

       Plaintiffs,

      v.                     Case No. 20-CV-768

TONY EVERS, et al.,

       Defendants.

---

## DEFENDANTS' RESPONSE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS

---

Defendants' opening brief demonstrates how anyone can get a voting ID with a single trip to the DMV. Plaintiffs do nothing to refute that fact. Because this is all that is required under *Luft*, summary judgment should be entered for the Defendants.

Plaintiffs fail to meaningfully engage the narrow issues on remand. On the small subset of extraordinary-proof applications that the Plaintiffs use for their entire argument, they disregard the Seventh Circuit's instructions to consider whether the IDPP is working reliably *now*. They ignore how the process has improved and use years-old evidence to ask this court to enter relief duplicative of, and beyond, what was just vacated.

Indeed, to read their briefs, one would think that this case is about CAFU's issuance of wallet-sized state I.D.s under extraordinary proof. It is not. The inquiry on remand is whether the IDPP is functioning reliably with regard to voting rights. Answering this inquiry must acknowledge that *every* applicant gets a voting ID receipt *automatically* upon entering the IDPP. And the thousands of applications never reach CAFU because hard cards are issued nearly immediately, and that most of the few of applications that reach CAFU are resolved without extraordinary proof.

Plaintiffs work hard to discredit the receipt element of the IDPP. (*See* OWI Br.[1] 3, 61; Luft Br. 6, 11.) The receipt allows an applicant to vote the entire time their application is pending. Every person with a receipt can vote, and every applicant has a receipt as long as he or she remains in minimal

---

[1] These consolidated cases have separate dockets and docket numbers, which can lead to inconsistent docket numbering conventions. Defendants citation to "OWI Br." and "Luft Br." refer to each set of Plaintiffs' opening briefs in this post-remand litigation.

contact with DMV. The Plaintiffs cannot prevail on their voting claims for someone who has a voting ID while their application is pending. Under the decisions already made in the long history of this litigation, the process is not an unconstitutional burden on voting.

## I.      Plaintiffs fail to engage the inquiry on remand.

This case is on remand after the Seventh Circuit vacated the prior judgment because "[t]he district court acted on a record assembled years ago," and "the state must be allowed to experiment and see what happens" with the IDPP. *Luft v. Evers*, 963 F.3d 665, 680 (7th Cir. 2020). Plaintiffs avoid every component of the remand. They use evidence from "years ago" to ask for relief that duplicates and exceeds what this Court ordered in 2016, all while ignoring the important and effective improvements to the IDPP. Their arguments are also exclusive to the CAFU portion of the IDPP, which involves less than one-tenth of IDPP petitioners. (Luft Dkt.[2] 404 ¶ 9.) Their briefs do not even engage the issue on remand, which is whether the IDPP as a whole is reliable now, after continuous improvement since the last trial.

Plaintiffs' evidence is centered on IDPP applications from up to four years ago. They give "examples of continued IDPP burdens despite SSA

---

[2] "OWI Dkt." refers to docket entries in Western District of Wisconsin case number 15CV324 and "Luft Dkt." refers to docket entries in Western District of Wisconsin case number 20-CV-768.

verification" from 2015. (OWI Br. 33 n.20 (citing Ex. 14); Luft Dkt. 394-14.) For example, to show that adopted applicants are having a hard time, they point to evidence from 2014, the year before the previous trial. (OWI Br. 44 n.29; Luft Dkt. 396-20.)[3] Under their heading "continued problems" of burden, they rely on petitions from 2014 and 2016. (OWI Br. 55 n.34; Luft Dkt. 392-2; 397-6.) And all their examples involving multiple trips to the DMV fail to acknowledge one, that those petitioners possessed valid voting credentials during that process; and two, that that applicants no longer need to make multiple trips to the DMV, because DMV now accepts documents digitally, including photographs of documents electronically submitted through a smart phone. (Luft Br. 10; Luft Dkt. 404 ¶ 20.)

Their alleged "[c]ontinued problems in 'matching' voters' birthdates" uses bullet-point examples from 2016 and 2017. (OWI Br. 51, 53–54.) And for "examples of the difficulties dealing with [out of state] bureaucracies," they rely on a petition from 2016. (OWI Br. 30 n.18; Luft Dkt. 397-8.) Their chief examples of "continued problems with missing or nonexistent records" are from

---

[3] The One Wisconsin Plaintiffs incorrectly cite Cassandra M. Silas—a named plaintiff—as having difficulty navigating the IDPP because of her adoption in Tennessee. (*See* OWI Br. 42–43.) However, Ms. Silas was born in Cook County, Illinois, and there had never been any allegation that she was adopted. (OWI Dkt. 141 ¶¶ 24–25.) The evidence they cite refers to another petitioner by name. (*See* OWI Br. 42 n.26 (citing Ex. 102).)

2015 and 2016 (OWI Br. 40–41). Indeed, they even extensively cite trial testimony from 2016. (*See e.g.* OWI Br. 42–43.)

These are not isolated examples. The Plaintiffs' filings include 109 exhibits related to individual petitioners. (Luft Dkt. 392–95; 405.) Of these, 35 are from 2014,[4] 2015,[5] or 2016;[6] 25 are from 2017;[7] and 30 are from 2018;[8] leaving fewer than 20 that reflect the processes from 2019 or 2020. Their evidence is severely skewed toward the past and does not meaningfully engage current, improved practices. This disregards the purpose and scope of this remand.

Plaintiffs' headline argument is a paradigmatic example of how their arguments disregard how the IDDP is working today. They present the 2017 petition of S.J.,[9] who had an Illinois ID card but whose birth records (needed to verify citizenship) were not confirmed. (OWI Br. 2–4; Luft Dkt. 394-16.) For months, the applicant did not respond to questions that could have resolved the application, and a hard card was ultimately not issued. But Plaintiffs concede, as they must, that processes have changed since S.J.'s application,

---

[4] Curtis Ex. 59, 60, 62, 70.
[5] Curtis Ex. 10, 14, 21, 30, 34, 41, 56, 84, 88.
[6] Curtis Ex. 2, 13, 18, 19, 25, 26, 33, 35, 47, 49, 51, 53, 76, 80, 81, 82, 83, 92, 94; Brown Ex. 4, 7.
[7] Curtis Ex. 4, 5, 8, 16, 17, 28, 40, 42, 44, 52, 57, 61, 68, 69, 73, 86, 95, 95; Brown Ex. 6, 12, 14, 15, 17, 18.
[8] Curtis Ex. 1, 3, 6, 12, 15, 22, 23, 24, 27, 31, 38, 39, 45, 48, 55, 64, 65, 67, 72, 75, 79, 85, 89, 90; Brown Ex. 1, 2, 5, 8, 13, 16.
[9] S.J. is the initials of the pseudonym that OWI uses in their brief.

and if S.J. applied today her ID would likely have been granted.[10] (OWI Br. 4.) That is because DMV now contacts other states' DMV to verify birth records. (Luft Dkt. 404 ¶ 19.) This is exactly the sort of problem-solving that the Seventh Circuit discussed, and the Plaintiffs fundamental flaw of ignoring current procedures pervades their arguments.

Plaintiffs also ask for relief that is stuck in the past. Along with several new far-reaching requests for injunctive relief (OWI Br. 75–76), the One Wisconsin plaintiffs ask this court to "re-adopt" prior remedies and repeatedly asks the court to enter orders "as it did four years ago" in its requested relief. (OWI Br. 76–77.) And the *Luft* plaintiffs take swaths of their requested relief from what the "Court ordered in October 2016." (Luft Br. 2–3.) This ignores the 7th Circuit decision and the guidance provided therein.

Finally, Plaintiffs exclusively argue over the CAFU portion of the IDPP, which is not an evaluation of the IDPP. Of 10,046 IDPP applications since November 1, 2016, only 1,005—less than 10%—reached CAFU. This ignores, for example, the 3,415 that were immediately verified with DHS. Accordingly,

---

[10] Plaintiffs argument that "no one bothered to call . . . with this new and promising option" argument is unfounded. (OWI Br. 4.) DMV sent the applicant letters, called her daughter, tried six alternate phone numbers, tried email, and obtained a CLEAR background check to look for additional contact information. (Luft Dkt. 394-16.) The applicant did not respond to any of these attempts for months and DMV has no contact information that successfully reaches the applicant.

even the stale data and repeat requests for relief that the Plaintiffs engage is not a description of the current IDPP, as the Seventh Circuit ordered.

In contrast, Defendants explained in their opening brief how any person can get an ID with one trip to the DMV, regardless of what documents the person has. Applicants either promptly get a state ID "hard card" or continue getting a voting ID the entire time their application is pending. In the words of the Seventh Circuit, "the state issues a credential as a matter of course." *Luft*, 963 F.3d at 679–681. Plaintiffs identify nothing to contradict this, and the Defendants are entitled to summary judgment.

## II. Plaintiffs' filings demonstrate that the IDPP is working reliably.

Plaintiffs have not identified a *single person* who was unable to get a voting-compliant ID by making one trip to the DMV under current procedures. Nor do they identify anyone who stopped receiving IDs automatically unless they were unqualified or did not respond to multiple contact attempts for at least seven months. Additionally, they present no evidence whatsoever that current outreach is insufficient.

This is not for lack of effort. With 17 counsel of record, Plaintiffs have scoured hundreds of thousands of pages of documents, presented 126 pages of briefing, 205 exhibits, and detailed coding of individual applicants. (OWI Br. 11, 60) Additionally, Plaintiffs indicated during discovery that they

planned to contact more than 100, and as many as 250, IDPP applicants.[11] There is perhaps no stronger endorsement of the IDPP as a functioning system for providing voting IDs than 17 lawyers' inability to find a *single* witness who did not automatically get a voter ID under the current procedures.

They instead armchair quarterback DMV and WELEC's detailed inner workings and attempt to overturn the entire IDPP on things as superficial as a single phrase missing from a CAFU manual (OWI Br. 35) and the wording of the table of contents in an election guide. (Luft Br. 20.) Their process arguments are mostly supported by years-old stale evidence. However, drilling into some of their more-recent exhibits, the Plaintiffs' evidence shows that the IDPP is reliable.

For example, Plaintiffs identify the January 2020 application of J.S. as an example of problems with missing documents and exercise of discretion. (OWI Br. 42 n.25; Luft Dkt. 397-18.) As always, DMV promptly sent J.S. a voting credential. (Luft Dkt. 397-18.) CAFU then contacted J.S. to gather

---

[11] A disagreement arose as to whether data privacy law permits Plaintiffs to mass-contact IDPP applicants. DOJ requested notice and an opportunity to object if the *Luft* Plaintiffs expected to contact more than 100 people, to which Attorney Rotker replied on August 24, 2020: "we cannot agree to contact no more than 100 people. In an effort to resolve this matter, and although we do not understand why DOJ requires notice, we will agree to limit our contacts to 250 people and, in light of the time sensitivity of this matter, to give DOJ two days' notice if we plan to exceed that number."

information to use to issue a hard card[12]. CAFU learned that J.S. had previously lived in Louisiana, so they contacted the Louisiana DMV, which verified birth information, and DMV issued a hard card. (Luft Dkt. 397-22.)

Plaintiffs describe J.S. as a "Muslim petitioner [who] was not baptized so did not have baptismal record." (OWI Br. 42 n.25.) While that is true, it has little to do with J.S.'s application processing, and even less to do with the reliability of the IDPP. J.S.'s application was granted through state-to-state contact with Louisiana, not through religious affiliation or documentation. Through the IDPP, he promptly received a receipt and then a hard card and had a valid voting credential during the entire process. Plaintiffs counter characterization does nothing for their argument.

Consider also T.B., to use the naming from the Plaintiffs' brief, cited by Plaintiffs as an example of problems with the common law name change form. (OWI Br. 50.) T.B. filled out his ID forms on December 20, 2019. (Luft Dkt. 394-20.) The name that T.B. applied under did not verify with DHS. On January 22, CAFU recognized that the issue was the spelling of T.B.'s name; the application included a different spelling than T.B.'s birth record. That same day, DMV both left T.B. a phone message and mailed T.B. a Common Law

---

[12] A hard card ID card cannot and must not be issued until citizenship is verified. There are no means to retrieve an 8-year card after issuance. The only control on that item is its stated expiration which can be identified at the poles.

Name Change form. DMV received the filled-out form on February 5, and T.B.'s ID was issued on February 13. (Luft Dkt. 394-20.) The entire process took less than the 60-day term of an initial ID document.

OWI asks about T.B.: "What happened to the 'more likely than not' standard?" (OWI Br. 50.) The answer is that T.B. received an ID within 5 days of going to DMV, the Common Law Name Change process got him his 8-year card in less than two months, and he had a valid voting credential the entire time. This shows the reliability of the process.

Plaintiffs also identify K.M., who applied on April 4, 2019. (Luft Br. 8; OWI Dkt. 405-9.) K.M. was born in Ghana, and DHS was unable verify the foreign birth record. Without any input needed from K.M., DMV verified U.S. citizenship with the U.S. Department of State and issued an ID. (OWI Dkt. 405-9.) Plaintiffs' criticism is that DMV should have stopped the application after K.M.'s social security information verified. (Luft Br. 14.) This argument makes no sense because non-U.S. citizens can properly have social security cards and accounts. DMV correctly processed K.M.'s application, and K.M. had a valid voting credential the entire time that DMV was verifying citizenship.

To that point, Plaintiffs point out the application of S.V., who applied on February 12, 2020 with a valid driver license. (Luft Dkt. 397-22; OWI Br. 67 n.41.) S.V. checked the box on the form affirming that "I certify that I

am a U.S. Citizen." CAFU checked with the U.S. State Department which informed it that S.V. is not, in fact, a U.S. citizen.[13] (Dkt. 397-22.) This is an example of how the IDPP reliably handles applications that need to be cancelled, as well as those that need to be granted. Indeed, as Plaintiffs themselves identify, another cancellation was a person who applied for IDs in two identities by wearing thick-framed glasses in an apparent attempt to defeat facial recognition. (Dkt. 397-16; OWI Br. 71.)

This evidence, of the Plaintiffs' choosing, only adds to the examples in the Defendants' opening brief, all showing that the IDPP is functioning reliably. Plaintiffs' characterizations and reliance on stale facts cannot overcome this conclusion.

### III. Plaintiffs' various arguments are unsupported by the record.

Having found no one who could not get a voting-eligible ID with reasonable effort under current procedures, Plaintiffs turn to DMV and WELEC's internal affairs with microscopic criticism. But even these arguments fail because they misdescribe, or misunderstand, the process, are unsupported by evidence, or simply fail as a matter of common sense.

---

[13] There are states that issue DLs to non-citizens. This is why a confirmation of birth record is required even when a DL is presented.

### A. Several of the Plaintiffs' arguments rely on misunderstandings of the IDPP.

Plaintiffs point out that a small fraction of IDs are issued through CAFU's processes and attempt to argue that this must mean that the process is too burdensome for most people. (OWI Br. 24.) They leave out that only a small portion of IDPP applications go into CAFU in the first place. (Luft Dkt. 408 ¶ 9.) The vast majority of petitions are resolved quickly without even entering CAFU. (Luft Dkt. 408 ¶ 9.) Their comparison of CAFU issuances to all IDPP applications is a classic denominator problem, and not at all probative of the success of the IDPP.

Plaintiffs seem to argue that the common law name change form should be given to a petitioner at the beginning of the process. (OWI Br. 47; Luft Br. 31.) But the name change form is only relevant when the name on the application given by a petitioner does not match social security information, which is discovered later. Simply put, DMV does not know if a name change form is needed until the name is run. It would be highly confusing and inefficient for the vast majority of people without name discrepancies to be offered a name change document.

They continue to argue that an applicant cannot get an ID unless their application is a "perfect match" to social security records. (OWI Br. 32.) As was made abundantly clear in depositions, the issue is that DMV cannot issue an

ID in a different name than official social security records—this could lead to multiple identities and potential fraud. (OWI Dkt. 384:9–11.) However, if the name on other documents do not "match," an applicant can easily use the common law name change form, which reconciles the discrepancy. This is not an impediment to getting an ID. Plaintiffs' point may be that a person may prefer that they have a different name in social security records, or a different name entirely, but this not an impediment to getting an ID in a person's lawful name for voting.

What does matter is that the IDPP must not become a mechanism for a person to get multiple valid, voting-compliant IDs in multiple names. That is what the name matching process does.

On this issue, Plaintiffs argue that the "one letter" name-difference exception is somehow harmful. (OWI Br. 49.) This is a common-sense procedure that benefits petitioners and reflects that a one-letter difference is likely a typo and is very unlikely to create a whole new name. The SSN matching also prevents interference with Social Security benefits, which can happen if a person uses an ID with a different name than is tied to social security. Plaintiffs' criticism is difficult to square with their position that the process is burdensome, because it is an accommodation to a person with a typo on a birth record. In any event, a spelling difference prevents no applicant from getting an ID, as that is what the common law name change affidavit does.

Both sets of Plaintiffs criticize DMV for verifying U.S. citizenship if the individual's social security number is verified, particularly if the applicant verifies that he or she is a citizen. (OWI Br. 27; Luft Br. 1–2, 41.) But non-citizens have valid social security numbers, and the IDPP form already requires an applicant to certify that they are U.S. citizens, which has not stopped several non-citizens from applying. In contrast, a U.S. citizen applicant is completely unburdened by the verification process, because he or she maintains a valid voting credential the entire time.

There is no evidence of anyone being falsely denied an ID on non-citizenship grounds. Plaintiffs raise the application of W.S., who was born in Philippines and applied for an ID asserting that he was a U.S. citizen. (OWI Br. 67–69; Luft Dkt. 397-17.) W.S.'s ID application did not indicate it was for an ID for voting purposes,[14] but it would not support the Plaintiffs' arguments even if it were. (Luft Dkt. 397-17:11.)

W.S. indicated that W.S. is a foreign-born child of a U.S. citizen, and was a citizen on that basis. CAFU contacted ICE, which had no record of citizenship. Plaintiffs latch on to ICE's single sentence, indicating that it was

---

[14] Applicants applying for an ID indicate that they need a free ID for voting by checking that option on the application form. W.S.'s application did not select that option. People get state IDs for many different reasons and W.S.'s individual reasons are unknown. However, DMV processed the application under the presumption that W.S. would use it to vote, and even sent him a new form where he could indicate the ID would be used for voting, and continued his application to the extraordinary proof process. (Luft Dkt. 397-17.).

still possible, despite ICE's lack of records, that the applicant was the child of a U.S. serviceman. (OWI Br. 69.) Plaintiffs omit that CAFU also contacted the U.S. State Department, which would have record in that event. (Luft Dkt. 397-17:6; 384:20.) And U.S. Census data did not have any information matching the family information that W.S. identified. Even then, CAFU asked for additional census information, but W.S. never responded, even after multiple attempts. (Luft Dkt. 397-17:9–10.) Months later, DMV was faced with no ICE verification, no State Department verification, no census verification, and no response from the applicant. They cancelled the petition, and reasonably so. (Luft Dkt. 397-17:24.)

## B. Several of the Plaintiffs' argument are unsupported by evidence.

Plaintiffs contend that the Defendants have "not engaged in meaningful public education regarding IDPP." (Luft Br. 33, 35; *see also* OWI Br. 72.) They have no shortage of outreach demands but *zero* evidence that current outreach is insufficient. Indeed, they do not even offer a metric or standard for what sufficient could mean, and instead just recite conclusions such as "the State therefore needs to ensure . . . clarity" and "DMV likewise does very little." (Luft Br. 35.) Defendants' opening brief explains the comprehensive, multi-channel outreach already underway. Indeed, just this week, this Court in another election case held that WELEC has "produced content to educate

voters on 'unfamiliar aspects of voting' for use by local election officials, voter groups, and the public." *Edwards v. Vos* (DNC), No. 20-cv-340 (W.D. Wis.), at Dkt. 337:24–25. Plaintiffs offer no evidence that these efforts are insufficient.

Plaintiffs' descriptions of outreach are also inaccurate. For example, they argue that "WEC's posts on its social media account will not begin until late September" and media availability "will occur on a single day in mid-October." (Luft Br. 28.) But a simple review of the WELEC's twitter account shows media including "Interested in getting a free ID for voting purposes?" with links to additional information released before briefs were filed,[15] and WELEC has already held a press conference that included IDPP information. (Luft Dkt. 404 ¶ 20.) Plaintiffs describe IDPP information as "buried on WEC's website," where the front page of the website has a bold, large text, colored banner stating "Free State ID Cards for People without Birth Certificates" with a description of the process, a graphic of an informational poster, and links to more information.[16] Plaintiffs' arguments are belied by easily accessible evidence.

Plaintiffs likewise argue that the term of the receipts causes problems, such as for people who are homeless. But the current IDPP includes robust

---

[15] https://twitter.com/WI_Elections?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor (post from September 15, 2020)
[16] https://elections.wi.gov/

procedures for addressing undeliverable mail, and the last trial established that homeless voters are able to get receipts. (*See* OWI Dkt. 396-3:27.) More fundamentally, Plaintiffs' evidence undermines their arguments. For example, they point to people who did not get a document in the mail as including applicants who moved out of state without telling DMV. One exhibit shows an applicant who did not reply to multiple phone calls, and email, or letters, and where a CLEAR report shows he had moved to Illinois. (*See* Luft Dkt. 394-4.) Another exhibit shows an applicant who likewise moved to Nevada and did not respond to the phone number or email address the applicant gave. (*See* Luft Dkt. 394-8.) The IDPP is not failing when out-of-state residents do not continue in the process.

Plaintiffs also argue that a "looming general election mail crisis" will create an ID delivery problem. (OWI Br. 73.) Their briefing includes a few links to news articles about mail-in ballot processing and a news article reporting that mail is faster now than in July and August, but make no connection to ID mailing procedures, which allows time for a new receipt to be received well before the prior one expires. The main thrust of this argument is that DOT apparently should have disregarded state law and issued receipts valid for longer than 60 days, based on nothing more than Plaintiffs "repeatedly ask[ing]" them to do so. (OWI Br. 74.) Their unilateral demands that DOT ignore the law is not a valid argument in support of an injunction.

Indeed, any pandemic-related arguments involving photo ID were rejected by this Court, just this week, when it concluded that plaintiffs in the consolidated Democratic National Committee cases failed to establish "that the COVID-19 pandemic amplifies the typical burden of requiring a photo ID, so as to outweigh the State's repeatedly recognized interest in doing so." *Edwards,* at Dkt. 337:58.

Plaintiffs also argue about DMV staff's ability to use common sense "discretion" to issue IDs, but they rely on 2016 trial testimony and do not identify a single instance of a problem related to discretion. (OWI Br. 38–40.)

For one of their arguments, Plaintiffs have purported to create their own evidence. (OWI Br. 60.) In the scheduling stage of this round of litigation, Plaintiffs requested racial information about IDPP applicants. Defendants explained in depositions that no such tracking exists; race is not a component of the IDPP. (OWI Br. 59; Luft Dkt. 385:5.) Even so, DOT evaluated whether it would be feasible to create a document tracking race, to assist the Plaintiffs. (Luft Dkt. 385:5; OWI Dkt. 396-5.) Although such custom analysis is outside of any proper discovery demand, Defendants diligently searched for a way to accommodate the Plaintiffs' request, including engaging their IT staff to see if custom programming could be created to make such a report.

The result was that the datasets involved do not have matching data that could make a report reliable. As explained to the Plaintiffs, "the various

datasets involved would not have a high degree of reliability," "risks of over and under inclusion, and would be difficult and time consuming to test for accuracy." (OWI Dkt. 395-5.) Therefore, even if DOT were to attempt to do the work, the outcome would not be reliable to a degree that has evidentiary value. (*Id.*)

Plaintiffs characterize this time-consuming, good-faith evaluation of whether DOT could help them as "WDOJ and WDOT have **refused** to undertake the work." (OWI Br. 59.) But no amount of bold and italics can create reliable evidence that does not exist.

Plaintiffs apparently attempted to create the evidence on their own, but their output has no evidentiary value. They report that they "coded" 988 petitions, but not 12,355 others. (OWI Br. 10 n.7.) They reveal nothing about the sampling they used or the process of "coding" race, or how applications with no race information were "coded." This undisclosed procedure, performed by non-neutral advocates, has no persuasive value.

Additionally, their arguments about race involve a legal question that is already answered, and which is not at issue in this remand. As far back as 2014, the Seventh Circuit held that statistics that purport to show ID issuance disparate outcome "do not show a 'denial' of anything by Wisconsin, as § 2(a) requires; unless Wisconsin makes it *needlessly* hard to get photo ID, it has not denied anything to any voter." *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir.

2014). And, just this year, the Seventh Circuit reversed a prior finding of racial discrimination on evidence like the Plaintiffs present now because "equating the two would treat disparate impact as a constitutional violation." *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020). Their statistic-based argument has no merit.

### C. Plaintiffs' other argument miss their intended mark.

OWI complains that DMV is using "invasive" CLEAR reports to contact petitioners who have stopped responding to DMV. (OWI Br. 57–58.) They even suggest that this practice is the result of failing to "heed the court." (OWI Br. 58.) Plaintiffs appear to have forgotten that they were the ones who asked that CLEAR reports be used for this purpose.

On October 4, 2016, OWI filed a motion arguing that DMV was not doing enough to contact people who had stopped returning calls or letters. They specifically criticized that "DMV apparently has not, for instance, obtained CLEAR reports that could provide updated contact information for these voters." (OWI Dkt. 262:8.) On that request, this Court ordered on October 26, 2016 that: "The DMV must attempt to contact family members or associates of the petitioner using whatever contact information is available, including information from CLEAR reports." (OWI Dkt. 306:2.) OWI's current arguments that DMV is violating voting rights by using CLEAR reports is meritless.

Likewise, Plaintiffs complain that DMV works with other state agencies to process applications. (OWI Br. 25–31.) This is perplexing in light of their prior allegations and fundamental argument that the process should minimize burden on applicants. (*See* OWI Dkt. 141:63–64; Luft Dkt. 31:39–48.) The point of the multi-state coordination is that the petitioner does not have to do anything more than show up at the DMV with what documents he or she has, and answer follow-up questions if needed. An applicant immediately gets a voting credential and keeps it for the entire time that DMV is coordinating with other agencies. DMV does the work. Plaintiffs even mock CAFU's efforts as "weird." (OWI Br. 27.) But they cannot show that CAFU's diligent work, during which time the applicant has an ID, is an unconstitutional burden on voting.

Plaintiffs' briefing is filled with mischaracterizations and unsupported jabs, and the Defendants do not respond to the vast majority because there are more important issues to address. However, one item warrants a response because its import goes beyond the back-and-forth of this round of briefing.

OWI states that on August 14 it requested that the Defendants conduct outreach similar to 2016 "but defendants have not responded and have made no such commitment." (OWI Br. 73 n.45.) This is false, but more importantly highlights why these cases need to conclude.

Since the remand, Defendants have spent an enormous amount of time producing documents as demanded in real-time by the Plaintiffs, including outreach materials. Susan Schilz, the head of CAFU, Kristina Boardman, the Administrator of the entire DMV, and Meagan Wolfe, administrator of the Wisconsin Elections Commission, were all deposed by the Plaintiffs. (OWI Dkt. 384; Luft Dkt. 385; 388.)

In particular, Ms. Wolfe's deposition focused primarily on outreach, and she answered all of the Plaintiffs' questions. (OWI Dkt. 388.) She had previously informed the Plaintiffs that she had a stop time and told Plaintiffs' counsel during the deposition that she had a meeting with KW2, the agency's advertising firm for voter outreach. (OWI Dkt. 388 (Wolfe Dep. 120:10–18).) Nonetheless, Plaintiffs counsel kept her in the deposition another 20 minutes, which kept her from the meeting where she could have been productively working on actual outreach. (Dkt. 388:35.) Ms. Wolfe diligently stayed and answered Plaintiffs' questions until they were done. Plaintiffs now do not even acknowledge that Defendants have responded to their information request. (OWI Br. 73.)

After nine years of litigation, these cases need to end. Plaintiffs provide no evidence of ongoing constitutional violations: everyone who seeks an ID can obtain one with minimally reasonable effort. Because that is all that *Luft*

requires, Plaintiffs' request for a preliminary injunction must be denied, and summary judgment entered for Defendants.

### IV. Plaintiffs have not provided evidence to support their requested preliminary injunctive relief, and such requests are either unnecessary, overly broad, or vague.

In the event this Court does not grant summary judgment for Defendants, Plaintiffs' various requests for relief should nonetheless be rejected. Plaintiffs' specific proposals for preliminary injunctive relief would essentially have this Court rewrite various statutes concerning the IDPP and alter operations at DMV in many unworkable ways. It would also strain WELEC in ways that unnecessarily interfere with its most fundamental and immediate concern, which, at the moment, is administering an election in a pandemic that is only 40 days away. And most notably, most of Plaintiffs' requested relief is unmoored from what is appropriate or necessary given the limited issue on remand in these cases.

The only issue in this case is whether the IDPP imposes an unreasonable burden on voters that enter it. No evidence presented by the Plaintiffs in these cases supports that any IDPP participants or potential participants will suffer irreparable harm resulting from a lack of knowledge about the IDPP, or that they will fail to get a voting credential after they enter the IDPP. As a result, Plaintiffs' requests for preliminary injunctive relief are beyond the scope of the issues remaining in this case.

Moreover, many of the specific proposals are overly broad and vague. Under Fed. R. Civ. P. 65(d), any injunctive relief ordered by the Court must state its terms specifically and describe in reasonable detail the acts restrained or required. Plaintiffs' proposals for preliminary injunctive relief are riddled with vague terminology and indefinite requests. As such, they fail under Rule 65(d)'s requirements.

### A. Any preliminary injunctive relief must be no broader than necessary.

Even if this Court concludes that preliminary injunction is appropriate, it does not have unlimited equitable authority to craft whatever relief it chooses. If a party establishes the right to a preliminary injunction, its scope "must be 'narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful activity.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (quoting *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 299 (2d Cir. 1999)); *see also Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citation omitted) ("Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). That is in part because an injunction is an

"extraordinary remedy" whereby a court "directs the conduct of a party . . . with the backing of its full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citation omitted). Therefore, although "[a] district court ordinarily has wide latitude in fashioning injunctive relief," "a court abuses its discretion where the scope of injunctive relief 'exceed[s] the extent of the plaintiff's protectible rights.'" *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (citation omitted) (second alteration on original).

> **B.  Plaintiffs' have failed to produce evidence to support their requests for increased public outreach or for overhauling the IDPP process.**

Many of Plaintiffs' requests for preliminary injunctive relief are focused on extending public outreach regarding the IDPP. They have requested that the Court order such things as sending a mass mailing to anyone who registered to vote without an ID or driver's license; rehauling any of DMV's and WELEC's future mailings, publications, websites, and hotlines that mention the voter ID requirement; and offering palm cards to voter advocacy groups and personally training these groups on the IDPP before October 12. (*See generally* Luft Dkt. 399; OWI Dkt. 403:75–76.) DMV and WELEC had already done (or started) some of these things. For example, DMV already posts IDPP information at all of its field offices and photo-ID websites. (*See* Suppl. Boardman Decl., ¶¶ 19, 23, 9-21-20.) And WELEC has already been following its extensive voter outreach plan that includes promoting the photo

ID requirements and how to obtain a photo ID, including the IDPP. (*See* OWI Dkt. 402; Luft Dkt. 404.)

Notwithstanding, Plaintiffs have failed to produce any evidence to support a court order increasing in the public outreach efforts DMV and WELEC have, are, or will be engaging in. Despite the fact that Plaintiffs include various well-organized voter advocacy groups, they have failed to produce any evidence that anyone in need of the IDPP is currently unable to utilize it because of a lack of adequate public outreach. Stated differently, there is no evidence that a current lack of public outreach concerning how to obtain a compliant voter ID through the IDPP is unreasonably burdening individuals' right to vote. As acknowledged by the Associate Director for Citizen Action of Wisconsin, they utilized "expensive testing, research, polling, and data analysis" (OWI Dkt. 391 ¶ 3), yet have not produced any information on how many people need the IDPP but are burdened due to lack of public outreach.

In fact, the *Luft* district court has previously denied Plaintiffs' request for a mass mailing to notify voters who do not have a state ID or driver's license. *Frank v. Walker*, 196 F. Supp. 3d 893, 919 (E.D. Wis. 2016) ("Next, I address the plaintiffs' request that the preliminary injunction require the defendants to 'send an individualized mailing to all registered voters who do not appear in the DMV database as having acceptable photo ID' . . . I am not convinced that individualized notice to voters is required to prevent

irreparable harm . . . . . Accordingly, the plaintiffs' request for an order requiring individualized notice will be denied." This request was denied four year ago; there certainly is no basis for implementing this type of expensive and unnecessary preliminary injunctive relief now.

Other specific requests for preliminary injunctive relief focus on requiring DMV to change its IDPP practices or overhauling parts of the election process, including altering when and how petitioners receive temporary receipts; creating an affidavit exception for petitioners at the polls and modifying the provisional ballot process; modifying the statutory process for issuing a state ID card; and creating a hearing for denied petitions or those pending for longer 180 days. (*See generally* Luft Dkt. 399; OWI Dkt. 403:75–76.) Just as with their public outreach requests, Plaintiffs fail to support that any of these reforms are necessary to remedy irreparable harm by way of an unreasonable burden on an IDPP petitioner's right to vote.

DMV and WELEC have explained, in the declarations being filed with this brief, how Plaintiffs' requests are specifically overly broad or not necessary. (*See* Suppl. Boardman Decl., ¶¶ 3–23, 9-21-20; Suppl. Wolfe Decl., ¶¶ 3–16, 9-21-20.) For the sake of brevity, those explanations will not be repeated here. But given Plaintiffs' failure to produce any evidence to support that individuals needing the IDPP, or petitioners in the IDPP are currently experiencing undue burdens on their right to vote, the scope of their proposed

preliminary injunctive relief is not tailored to fit the nature and extent of the claimed constitutional violation. As such, preliminary injunctive relief should be denied.

### C. Plaintiffs' requested preliminary injunctive relief violates Fed. R. Civ. P. 65(d).

Under Fed. R. Civ. P. 65(d), an injunction must "state its terms specifically," and "describe in reasonable detail–and not by referring to the complaint or other document–the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B) and (C). Many of Plaintiffs' proposals fail to abide by these requirements in several respects.

For example, Plaintiffs request that DMV issue a state ID card to any voter who has complied with *reasonable* requests for information, unless there is a *genuine reason* to suspect ineligibility. (Luft Dkt. 399:2.) Plaintiffs also request that DMV "establish a process that provides notice and a hearing before a neutral decision maker. . . ." (Luft Dkt. 399:2.) Preliminary injunctive orders such as these, along with others pointed out in the supplemental declarations filed with this brief, would be fraught with ambiguity and violate the basic requirements of Rule 65(d) and should not be adopted by the Court.

### V. The Defendants are entitled to summary judgment.

This case is ripe for summary judgment. The amount of state resources consumed by this litigation over the past 9 years is nearly immeasurable.

There have been enormous document requests requiring the Defendant to produce millions of pages of documents, depositions, trials, and appeals. This Court and the Seventh Circuit have answered essentially all of the legal questions, with only this narrow issue on remand remaining. Plaintiffs' briefing suggests that they plan an entirely new wave of litigation after the election, doubtlessly with new burdensome document requests and depositions, even after they just deposed DMV and WELEC officials.

The legal questions have been answered and this litigation should end. Defendants request summary judgment now. Plaintiffs have not, and cannot establish, that the IDPP is an unconstitutional burden on voting. To the contrary, it allows any person to automatically get an ID with just one trip to the DMV.

Plaintiffs have presented no witnesses and the documentary evidence has been exhaustively reviewed and discussed. While there is disagreement over the Plaintiffs' characterizations and legal conclusion, there is no dispute over any material facts. Anyone can automatically get an ID for voting by going to the DMV with what documents they have and filling out simple forms. Plaintiffs have presented no relevant contrary evidence and therefore the Defendants do not believe a hearing is necessary. However, Kristina Boardman, Administrator of the DMV and Meagan Wolfe, Administrator of the

Wisconsin Elections Commission, can be available if the Court has any questions.

After nine years, millions of documents produced, depositions, two trials, six district court decisions,[17] nine Seventh Circuit decisions,[18] and two U.S. Supreme Court proceedings,[19] the legal questions posed by Plaintiffs have been answered. No additional burdensome discovery or litigation is needed, and these cases are ready to conclude.

Dated this 22nd day of September 2020.

> Respectfully submitted,
>
> ERIC J. WILSON
> Deputy Attorney General of Wisconsin
>
> Electronically signed by:
>
> s/ S. Michael Murphy
> S. MICHAEL MURPHY
> Assistant Attorney General
> State Bar #1078149

---

[17] *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014); *Frank v. Walker*, 141 F. Supp. 3d 932 (E.D. Wis. 2015); *One Wisconsin Inst., Inc. v. Thomsen*, No. 15-CV-324-JDP (W.D. Wis. Aug. 11, 2016); *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Frank v. Walker*, No. 11-C-1128 (E.D. Wis. July 29, 2016); *One Wisconsin Inst., Inc. v. Thomsen*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019).

[18] *Frank v. Walker*, 766 F.3d 755 7th Cir. 2014); *Frank v. Walker*, 769 F.3d 494 (7th Cir. 2014); *Frank v. Walker*, 773 F.3d 783 (7th Cir. 2014); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016); *Frank v. Walker*, 196 F. Supp. 3d 893 (7th Cir. 2020); *Frank v. Walker*, No. 16-3003, 2016 WL 4224616 (7th Cir. Aug. 10, 2016); *Frank v. Walker*, 835 F.3d 649 (7th Cir. 2016); *Luft v. Evers,* 963 F.3d 665 (7th Cir. 2020).

[19] *Frank v. Walker*, 574 U.S. 929 (2014); *Frank v. Walker*, 575 U.S. 913 (2015).

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 267-8904 (Johnson-Karp)
(608) 266-3094 (Schmelzer)
(608) 294-2907 (Fax)
murphysm@doj.state.wi.us
johnsonkarpg@doj.state.wi.us
schmelzerjj@doj.state.wi.us