**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

ONE WISCONSIN INSTITUTE, INC., *et al.*,

      Plaintiffs,

    v.                              Case No. 15-CV-324-JDP

ANN S. JACOBS, Chair, Wisconsin
Elections Commission, *et al.*,

      Defendants.

---

JUSTIN LUFT, *et al.*,

      Plaintiffs,

    v.                              Case No. 20-cv-768-JDP

TONY EVERS, *et al.*,

      Defendants.

---

**JOINT PROGRESS REPORT**

---

Pursuant to this Court's May 27, 2021 Order, and in preparation for the July 30, 2021 status conference, the parties respectfully submit this Joint Progress Report that "identifies what they have agreed on and what discovery disputes they still have and that includes a proposed schedule for completing discovery." ECF No. 438. The parties agree and disagree as follows:

## I.  Plaintiffs' position and proposed schedule.

**Areas of Agreement or That Parties Are Working Toward A Resolution**

Defendants have produced supplemental discovery updating their production from the summer and fall of 2020. The parties have been meeting and conferring on a continuing basis about follow-up requests and questions about the production. The parties continue to work through some specific production issues, but at this point believe that they will be able to resolve most of them without need for the Court's assistance. For instance, Plaintiffs believe they are missing certain relevant documents for certain IDPP Petitioners, and Defendants have agreed to look to determine whether such documents have been previously produced, and to update their production if they have not. Similarly, Defendants and Plaintiffs have agreed to further production of documents for certain custodians using search terms, but are still conferring regarding the specific custodians and search terms. There are a handful of other document discovery issues on which the Parties are working cooperatively. The Parties do not believe it is necessary to burden the Court on these issues at this time.

Plaintiffs are continuing their review of the document production and identifying those individuals who they will ask to depose.  Plaintiffs will provide Defendants a list of desired deponents prior to the July 30 status conference, and the Parties will seek to come to an agreement about the number and identity of the deponents.  We will bring any disagreement concerning depositions, to the extent they arise, to the Court's attention promptly.

Defendants informed Plaintiffs on July 14 that they intend to propound interrogatories and requests for admission upon Plaintiffs. They provided Plaintiffs with a list of categories upon which they would likely seek this discovery, but reserved the right to revise and extend that list. Plaintiffs had proposed that Defendants serve this discovery by August 2 and Plaintiffs will

respond and/or provide written objections within 30 days, but Plaintiffs do not object to Defendants' proposal below of setting a mutual deadline of August 6, 2021 for service of additional written discovery requests. However, Plaintiffs request that the Court permit additional written discovery requests after August 6 if based on information discovered after August 6. In the event that a Party seeks to serve additional written discovery after August 6 and the receiving Party does not agree that it is proper, the Parties will seek the Court's assistance to resolve any such disagreement.

**Areas of Disagreement**

Public Education Documents

Plaintiffs maintain that discovery related to efforts to educate the public on the IDPP is relevant—and critical—to their challenge to the process. How the IDPP is being executed depends in significant part on people knowing about it and knowing what rules apply, especially because particularly vulnerable populations—lower-income individuals, for instance, or voters of color— use the IDPP at higher rates than other populations. How these populations learn about the IDPP is important to understanding whether the IDPP is being constitutionally executed. Five years ago, this Court recognized that the state had not adequately informed the public about the IDPP. *See, e.g.*, *One Wis. Inst. v. Thomsen*, 198 F. Supp. 3d 896, 964 (W.D. Wis. 2016), *rev'd on other grounds and remanded*, 963 F.3d 665 (7th Cir. 2020). In addition, this Court's September 28, 2020 order directed the Wisconsin Election Commission and the Department of Transportation "to provide targeted outreach to potential voters who are most likely to need the IDPP." ECF No. 427 at 2. Exploring whether and to what extent Defendants have meaningfully and adequately educated the public about the IDPP is necessary for Plaintiffs to develop their claims.

Moreover, the Defendants' proposed discovery asks whether Plaintiffs contend that any individual is being denied their right to vote because of any notice, publication, or advertisement of the IDPP, or lack thereof. Obtaining these notices, publications, or advertisements, to the extent they exist, is directly relevant to even responding to Defendants' proposed discovery. Finally, at no point have Defendants explained that producing these documents will be unduly burdensome. On the contrary, Plaintiffs believe this request regarding public education and outreach is a modest one. Plaintiffs requested public education documents from Defendants last fall. At the very least, Plaintiffs are entitled to review Defendants' current public education program. Plaintiffs would not pursue their claims related to public education if, based on a full production of the public education material, the deficiencies in public education identified by this Court have been resolved, but there is no way for Plaintiffs or the Court to evaluate that without receiving discovery on it.

Experts

Plaintiffs believe that limited expert testimony may be helpful to the Court, and request that the Court include in its scheduling order time for expert discovery. *See* Fed. R. Evid. 702(a); Fed. R. Civ. Pro. 26(b)(4); *see also Douglas Dynamics, LLC v. Buyers Prods. Co.*, No. 09-cv-261-wmc, 2010 WL 4118098, at *2 (W.D. Wis. Oct. 8, 2010). Plaintiffs acknowledge that the Court expressed the view that expert testimony may not be necessary for this phase of the case. Here, Plaintiffs attempt briefly to explain the subjects of expert testimony that they believe may be useful to the Court. We do not ask the Court to approve of any expert testimony or discovery at this point. Instead, we ask that the Court's schedule set a deadline for plaintiffs to present motions for proposed expert testimony and discovery, including the names, credentials, and summaries of opinions of any proposed experts. The Seventh Circuit framed the question for remand as whether the state's IDPP is currently being implemented in a constitutionally adequate manner. *See Luft v.*

*Evers*, 963 F.3d 665, 679-80 (7th Cir. 2020) (characterizing the IDPP as a "moving target" and emphasizing the need to evaluate based on State's current implementation of the IDPP). To that end, testimony on three topics concerning how the IDPP operates will aid the Court in its decision on its constitutional adequacy. Both sets of Plaintiffs last presented expert testimony about the IDPP in their respective cases in 2016. The State has asserted, most recently in its status report to this Court in May, ECF No. 435 at 11, that it has once again made changes to the way the IDPP operates, including changes since the proceedings in this Court last fall. The expert testimony did not and could not evaluate the current operation of the IDPP, or analyze whether the defects previously found by the Court had been fixed.

Plaintiffs ask the Court for leave to submit motions for leave to present expert testimony on up to three subjects related to the current operation of the IDPP:

(1) **Political Scientist with Expertise on Voter Access:** First, Plaintiffs wish to submit expert testimony from a political scientist with deep expertise on voting access. In particular, the expert would testify on what types of Wisconsinites disproportionately face unreasonable burdens as part of the IDPP and what types of burdens are primarily responsible for the constitutionally inadequate operation of the process. Defendant's production indicates that minority voters are not only less likely to have compliant ID, as has been litigated earlier in the case, but continue to struggle to get a permanent ID through the IDPP. For instance, many older Black voters born in the Jim Crow South, Black voters of all ages born in Cook County, IL, and Latino voters born in Puerto Rico and either do not have birth certificates or other acceptable "proofs" of birth, or have often-trivial discrepancies between their birth records and other government records. Many such voters have continued to be stuck in the IDPP for many months if not years, often to simply just give up in response to continued delays and hurdles. The expert intends to discuss not only birth

certificates but why it would be difficult to obtain and modify other vital documents, for example to change mistakes such as name spelling, and why the State's current insistence on that practice is keeping people locked into IDPP. Expert testimony would describe numerous ways in which some categories of Wisconsinites are unable to obtain with reasonable effort qualifying ID through the IDPP, expert testimony that explains the systematic causes of the problem, and why it repeats, may aid the Court not only in assessing the IDPP's constitutionality, but also in fashioning appropriate relief.

Below, Defendants misconstrue certain statements in *Frank II* and *Brnovich* to suggest that *only* evidence of burdens on individuals remains relevant, and that evidence of systemic burdens is irrelevant. Indeed, Defendants' argument turns the *Frank II* Court's holding on its head. The Court held that notwithstanding a purported lack of evidence of burdens on most people's right to vote, because the "right to vote is personal," if "even a single person eligible to vote is unable to get acceptable photo ID with reasonable effort," that person must be afforded a remedy so that they may vote. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). It did not hold that evidence of systemic burdens that have and will perpetually repeat due to the way the State implements the IDPP have no bearing on whether the IDPP is constitutional. Moreover, while *Brnovich* took issue with what the majority viewed as "artificially magnified" statistical differences in the context of Voting Rights litigation, it did not suggest that statistical evidence had no bearing on voting rights claims. Finally, the expert testimony outlined above would not be focused only or even primarily on statistical analysis, but rather a qualitative analysis of the reasons the IDPP is burdensome on individuals belonging to certain communities, and predictably results in the deprivation or burdening of such individuals' right to vote.

(2) **Public Education/Communications Expert:** Second, Plaintiffs seek to submit expert testimony about how a lack of public education and communications about the IDPP contributes to imposing unreasonable burdens on potential voters. Indeed, this Court recognized the inadequacy of the Defendants' efforts to inform the public about the IDPP in 2016. *See, e.g., One Wis. Inst.*, 198 F. Supp. 3d at 964. Although it has been nearly seven years since the IDPP was first created in September 2014, both because of the inadequacy of prior public education and the fact that many of the vulnerable voters who require the IDPP may also lack Internet access, many of these voters may be unaware that they can get an ID to vote without other documents. Moreover, Plaintiffs will establish that the IDPP has been changed so many times since it was created (nearly always because of developments in this litigation) that many people who have failed to obtain permanent IDs (often after several efforts) based on perceived gaps in their proof of identity can now use previously forbidden proofs.  For example, Plaintiffs believe the full IDPP record shows that hundreds and probably thousands of Black voters who were born in Chicago and moved to Wisconsin have failed through the years to obtain a permanent WI ID even though they presented valid IL drivers' licenses and other forms of ID.  But the DMV changed that rule last year, without telling any of the other IL drivers who had been rejected that they could now have Wisconsin IDs after all.  Many petitioners have been told during the IDPP's tortured seven-year history that it is not enough to present high school records in lieu of a birth certificate; to constitute acceptable "secondary evidence," education records must be from the "*early elementary*" years.  But that rule apparently was abandoned this year, again without any sort of corrective outreach, announcements, or the like.  There are many other instances of such U-Turn changes in the substantive and procedural rules without any corrective outreach to those who failed or gave up because of IDPP rules that no longer exist. In light of the Seventh Circuit's focus on evaluating the IDPP as it

functions today, testimony from an expert on crafting an appropriate and effective public education campaign may help inform the Court's decision about whether public outreach about and awareness of the IDPP program is currently constitutionally sufficient to reach Wisconsin residents who need it most. Expert testimony would also be useful in providing guidance for appropriate public education relief should the Court find current efforts insufficient.

(3) **CLEAR reports/ "best practices" in verifying individual identity**: Plaintiffs believe the Court may now benefit from limited, targeted expert testimony about CLEAR and similar investigatory services, their reliability, and DMV's failure to ensure that CLEAR reports (if permissible at all, which Plaintiffs continue to dispute) are given immediate consideration under the "more likely than not" standard and the presumption of eligibility discussed in the Seventh Circuit's *Luft* decision. Plaintiffs believe there may also be helpful expert testimony about "best practices" in other contexts involving personal background checks, including those associated with hiring practices, firearm purchases, agencies, and law enforcement.

This Court found in its July 2016 decision that CAFU "commonly" obtains "CLEAR background reports" from the National Comprehensive Report Plus Associates, which contain "a substantial amount of deeply personal information, including any criminal records, judgments and liens, residence history, home and vehicle ownership history, and a list of possible relatives and associates." 198 F. Supp. 3d at 914 n.5. DMV did not tell IDPP petitioners that it was compiling this extensive background information about them. This Court found that "having DMV personnel acquire and review a compilation of personal information imposes a substantial burden on the right to vote." *Id.*

The DMV's document productions last fall and in recent weeks show that nothing has changed. These invasive practices continue unabated; if anything, CAFU's reliance on CLEAR

reports appears to be on the rise. CLEAR is now an affiliate of Thomson Reuters, and one of the gold standards of comprehensive background investigations:

> Thomson Reuters CLEAR® is powered by billions of data points and leverages cutting-edge public records technology to bring all key content together in a customizable dashboard. Locate hard-to-find information and quickly identify potential concerns associated with people and businesses to determine if further analysis is needed. The user-friendly platform was designed with intuitive navigation and simple filtering parameters, so you can quickly search across thousands of data sets and get accurate results in less time.

https://legal.thomsonreuters.com/en/products/clear-investigation-software. CLEAR is used in many contexts, including anti-money laundering, child and family services, law enforcement, healthcare and insurance fraud, corporate security, and other personal background investigations. *Id.*

But just as troubling, CLEAR reports often establish that IDPP petitioners are more likely than not (if not beyond a reasonable doubt) who they say they are. Yet CAFU refuses to apply the "more likely than not" (which it calls "MLTN") standard to the intrusive information in these reports, instead subjecting petitioners to a variety of time-consuming, often-burdensome, cumulative, irrelevant, and frequently ridiculous "matching" requirements, spelling rules, and searches for school records, adoption files, Census records, and other distant proofs of identity. This issue was briefed and ready to be argued in September 2020 as one of the "checklist" of 15 objections Plaintiffs were raising against the IDPP. *See* ECF No. 403 at 57-58; ECF No. 420 at 21.

Defendants incorrectly suggest that the *One Wisconsin* Plaintiffs are taking an inconsistent position regarding the CLEAR reports from what they argued in a motion in 2016. (*OWI* Dkt. 262:8). As we pointed out in footnote 4 of that brief, Plaintiffs did not advocate the procurement of CLEAR reports for investigation of voter ID petitioners, but called out the State's hypocrisy in

procuring these intrusive reports as a matter of course to investigate its citizens' identity while declining to obtain or use them to find petitioners whose temporary receipts were returned as undeliverable:

> As this Court found in its July 29, 2016 decision, '[f]ull investigation by CAFU commonly involve[s] acquiring a CLEAR background report," which contains "residency history" and leads on "possible relatives and associates." Dkt. 234 at 25 n.5. The State should not be allowed to conduct background investigations for the purpose of evaluating voter ID petitioners but to refuse to use those same techniques to track those petitioners down so they can receive the credentials to which they are entitled.

Dkt. 262 n.4. Plaintiffs stand by that position, and there is no inconsistency with anything we say here.

Again, Plaintiffs do not ask the Court to endorse such testimony at this time, merely for an opportunity to present motions for the admission of such testimony.

### **Proposed Schedule**

Plaintiffs submit the following revised schedule for the completion of discovery. Plaintiffs disagree with Defendants' assertion that yet another round of summary judgment would be appropriate in this matter, and maintain that the remaining issues would be most efficiently resolved through a short trial. The Court denied Defendants' motion for summary judgment on these same issues last fall. Plaintiffs have informed Defendants that they are willing to be flexible about these proposed dates to ensure that both sides have an adequate opportunity to prepare for trial, subject of course to the Court's schedule and desired timeframes:

| | |
|---|---|
| Fact deposition deadline | October 1, 2021 |
| Motions to Submit Expert Testimony (along with expert reports and disclosures) | October 11, 2021 |
| Briefs in opposition to proposed expert testimony | October 31, 2021 |

| Hearing on expert motions | Early November 2021 |
| --- | --- |
| Additional expert testimony (if allowed by the Court), including rebuttal experts and expert depositions. | Early November 2021 to December 31, 2021 |

## II. Defendants' position and proposed schedule.

Since the May 27 status conference, Defendants timely produced tens of thousands of DMV documents, produced additional information at Plaintiffs' requests, and are prepared to serve their discovery requests on Plaintiffs. Based on the parties' recent meet-and-confer, Defendants believe that this case is on the track that Defendants proposed in the May 20, 2021, joint status report (Dkt. 433:13) and remains on track for timely resolution, on stipulations, by early 2022.

Contrary to Plaintiffs' contentions, discovery on public-outreach efforts by the Wisconsin Elections Commission (WEC) or DMV is not necessary and is outside the scope of the question on remand. Likewise, expert testimony would not be helpful to resolving the narrow issue on remand.

The following provides a short update on discovery exchanges over the past month and a half; Defendants' few requested categories of discovery; explanations of Defendants' position on Plaintiffs' remaining discovery requests; and a proposed schedule to govern further discovery and proceedings.

### A. Update on Discovery Following May 27 Status Conference

At the May 27 conference, Defendants committed to providing Plaintiffs with updated discovery consistent with the agreed updates provided since Fall 2016. Defendants agreed to produce those updates by June 22. As with prior updates, these included CARs (Case Activity Reports) for every IDPP applicant, DMV's policies and procedures, IDPP training materials, IDPP

reports, quality assurance measures, and other IDPP-related materials. Before that deadline, Defendants produced documents on a rolling basis, while the parties' counsel engaged in regular communication, including Defendants' multiple, timely responses to Plaintiffs' inquiries and supplemental requests. Defendants completed the updated DMV production on June 21. That production consisted of 57,271 documents.

Over the course of late June and early July, the parties were in regular communication related to additional requests by Plaintiffs. In response to those requested, Defendants have produced dozens of additional documents, as well as narrative responses to Plaintiffs' questions about the scope of the production as well as individual documents.

The parties most recently conferred on July 20 to discuss: (1) a handful of outstanding requests on both sides; (2) the parties' respective views about the trajectory of discovery and briefing/trial; and (3) how best to prepare the required joint status report. Following the parties' meet-and-confer, a few outstanding requests and issues remain. Guidance from this Court will be helpful to guide the trajectory of any further discovery and proceedings.

### B. Defendants' Proposed Discovery requests

Defendants seek to discover information from Plaintiffs regarding who, if anyone, Plaintiffs contend has been unable to obtain a qualifying ID for voting through the IDPP, and also about any IDPP processes that Plaintiffs believe unconstitutionally burden an individual's right to vote. These requests are narrowly tailored to the issue on remand. Specifically, Defendants propose narrow and targeted discovery requests as follows:

1.      Identify any and all individuals who you contend are being denied the right to vote because of the IDPP.

2.      Identify any and all individuals who you contend have not been able to obtain a qualifying voter ID after entering the IDPP.

3.      If any individual identified in response to interrogatory #1 or #2 is the subject of a Case Activity Report ("CAR") that was produced by Defendants in 2021, state the CAR number or identifying Bates number for the CAR for each individual.

4.      If any individual identified in response to interrogatory #1 or #2 is not the subject of a Case Activity Report that was produced by Defendants in 2021, state the home address, phone number, and email address of any such individual.

5.      Describe any IDPP process, procedure, training, or convention that you contend places an unreasonable burden on an individual's right to vote, and provide the complete factual basis for that contention.

6.      If you contend that any individual is being denied the right to vote because of the publication, notice, or advertisement of the IDPP—or the lack of such publication, notice, or advertisement—provide the complete factual basis for that contention.

7.      If you contend that any individual is being denied the right to vote on account of race or color, provide the complete factual basis for that contention.

8.      Identify what type of injunctive relief you seek in this case.

9.      Produce (or identify by Bates number) every document that supports your answers to interrogatories 1–8.

10.     Admit that you are not aware of any individual who has applied for a voting credential through the IDPP since June 29, 2020 and who was unable to vote due solely to the lack of qualifying identification. If your response to RFA is anything other than an unconditional admission, provide the complete factual basis for your response, including identifying every individual who was unable to vote due to the lack of qualifying identification.

Defendants may additionally request further discovery as necessitated by any responses to these stated above, and will depose any witnesses Plaintiffs would designate for trial and any expert witnesses that might be allowed.

### C. Defendants' Responses to Plaintiffs' Proposed Expert Designations and Discovery Requests.

The parties recent July 20 meet-and-confer was productive and most issues were resolved without dispute. Plaintiffs made some unobjectionable requests for additional information and documents that Defendants will produce.

However, on two other issues, Defendants request assistance from this Court. Specifically, Plaintiffs have requested discovery on public outreach and expert testimony, both of which are not relevant to the issue on remand and would cause unnecessary burden and delay. Defendants request clarification that this discovery is outside the scope of this narrow remand.

### 1. Discovery on public education efforts by WEC and DMV does not implicate any remaining legal claim, is outside the scope of this remand, and is unnecessarily burdensome.

In addition to the thousands of DMV documents Defendants have already produced related to the current functioning of the IDPP, Plaintiffs have also requested documents related to DMV's and WEC's public outreach efforts on the IDPP. Defendants have cooperatively responded to similar requests in previous stages of litigation. However, given the far narrower focus of the case on the actual functioning of the IDPP, Defendants do not believe that these requests are pertinent to the remaining issue on remand, for two reasons.

First, this Court has recognized that the issue on remand will be sharply focused on the extraordinary-proof process. This focus does not contemplate further discovery or proceedings on how DMV (much less WEC) is generally disseminating information about the IDPP.

Second, Plaintiffs have not identified any support for the proposition that such public outreach is a constitutional issue that remains in this case. The sole issue now before this Court is whether the IDPP, as it is currently functioning, allows every eligible voter to obtain a voting-qualifying ID with reasonable effort as a constitutional matter. *See Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020). Advertisement about the existence of the IDPP is simply not a part of that question.

Election public education is governed by state statute, not a constitutional mandate. WEC's outreach obligations are governed by Wis. Stat. § 5.05(12), (13). These provide, for example, that

WEC "may conduct . . . educational programs to inform electors about voting procedures, voting rights, and voting technology" and shall "maintain a toll-free telephone line for electors "to obtain general election information, and to access information concerning their registration status, current polling place locations, and other information relevant to voting in elections." Wis. Stat. § 5.05(12), (13). There has been no claim that WEC is not complying with these statutory obligations and, even if there were, that claim would be outside the scope of this case.

Additionally, Plaintiffs have never identified (and likely would not be able to identify) any meaningful standard by which federal courts would analyze, as a constitutional matter, whether a state's public-outreach efforts are constitutionally deficient.

Lastly, nothing in the operative complaint in *Luft* supports the implication that current public outreach efforts regarding the IDPP are constitutionally or statutorily deficient. While Plaintiffs' 2012 amended complaint (*Luft* Dkt. 31) and proposed 2017 supplemental complaint (*Luft* Dkt. 342-1) mention public education broadly, nothing relates to current WEC and DMV public education efforts regarding the IDPP. And since that time, public outreach concerning the IDPP has been addressed repeatedly through prior Court orders after thorough review of WEC's and DMV's more recent IDPP public education efforts. Any public education claims are no longer viable given WEC's and DMV's adoption and incorporation of every IDPP public notice and education process deemed constitutionally necessary by this Court. Plaintiffs have not even attempted to amend their operative complaint to allege that these current efforts are constitutionally deficient. There is no reason for additional burdensome discovery on a claim not a part of this litigation.

**2. Expert witnesses would be unhelpful and would unnecessarily add to the delay and expense of this case.**

Plaintiffs indicate that they wish to add multiple experts to this remand. Categories of potential expert testimony include: (1) how the IDPP might be impacting certain groups of voters; (2) how WEC's and DMV's public-outreach efforts might be reaching certain communities in Wisconsin; and (3) explaining CLEAR reports. However, no expert witnesses are appropriate to decide the sole issue on remand, which involves only whether the IDPP imposes unreasonable burdens as a constitutional matter on individual voters' ability to obtain an ID for voting.

This is not the broad challenge to voter ID laws that the Plaintiffs brought ten years and nine Seventh Circuit decisions ago. The Seventh Circuit has now been repeatedly clear that the remaining issue relates to an individualized and personal right to vote—protecting "[e]very citizen's interest in individual treatment." *Luft*, 963 F.3d at 680, *see also id.* at 969; *see also Frank v. Walker*, 819 F.3d 384, 386–87 (7th Cir. 2016) ("*Frank II*"). Because "[t]he right to vote is personal," unaffected by how others might experience a state's election laws, there is no role for experts in the current remand to opine, for example, on how a state's voting system allegedly impacts groups of voters, much less how public-outreach efforts allegedly reach certain communities in the state. *Frank II*, 819 F.3d at 386; *see also Luft*, 963 F.3d at 679–80. The Seventh Circuit, in this very case, has previously rejected the type of analysis that the Plaintiffs propose now. *Frank*, 768 F.3d at 752.

Indeed, the Supreme Court recently singled out these Plaintiffs' use of expert testimony to improperly amplify the impacts of a state's voting system on certain voter groups. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2339 (2021). In the context of a Voting Rights Act claim, the Court's opinion highlighted that the "use of statistics" can often be "highly misleading"

when attempting to establish a single law's burden on individual voters. *See id.* at 2345. The Court cited previous arguments made and rejected in *Frank*. *Id.* at 2345 ("use of statistics was highly misleading for reasons that were well explained by Judge Easterbrook in a § 2 case involving voter IDs.").

Moreover, *Brnovich* also reaffirmed that an otherwise permissible law, like Wisconsin's voter ID requirement, will not be invalidated based on impacts to individuals or even discrete groups. *See Brnovich*, 141 S. Ct. at 2348 n.21. Instead, such individual or small cluster impacts are to be addressed through established statutory procedures for remedying alleged agency errors. *See id.* (noting that "[a]n alleged failure by the Postal Service to comply with its statutory obligations in a particular location does not in itself provide a ground for overturning a voting rule that applies throughout an entire State"). That decision is consistent with the Seventh Circuit's prior decisions in this case indicating that the burden inquiry is an individual one.

Here, the issue is whether the IDPP imposes a burden of constitutional magnitude for the small number of qualified electors who use it to obtain an ID for voting. That question will be resolved based on various IDPP petitioner files, which will show that, as before, everyone who avails themselves of the IDPP obtains a voting-qualifying ID with reasonable effort. *See Luft*, 963 F.3d at 679. Expert opinions on "types of Wisconsinites" is not relevant. The Seventh Circuit did not need experts to make this assessment last time, *see id.*, or the time before that, *see Frank II*, 819 F.3d at 386–87, and Plaintiffs will not be able to show why experts would be necessary or appropriate now.

Finally, Plaintiffs' suggestion that an expert is needed regarding CLEAR reports is meritless. The impact of a CLEAR report on any application is apparent from the application report. The Court does not need an expert to explain what a CLEAR report says or what it means

for an individual application. Plaintiffs' argument that such reports are intrusive or somehow harmful is outside the scope of the remand and is perplexing because CLEAR reports are in IDPP applications at their request.

Several years ago, One Wisconsin filed a motion arguing that DMV was not doing enough to contact people who had stopped returning calls or letters. They specifically criticized that "DMV apparently has not, for instance, obtained CLEAR reports that could provide updated contact information for these voters." (*OWI* Dkt. 262:8.) On that request, this Court promptly ordered on October 26, 2016 that: "The DMV must attempt to contact family members or associates of the petitioner using whatever contact information is available, including information from CLEAR reports." (*OWI* Dkt. 306:2.) Plaintiffs' current argument appears to be that DMV is doing something wrong by complying with a court order that granted the relief that Plaintiffs asked for. That argument is meritless. But, merits aside, expert testimony is not required to explain the contents, use, or effects of such reports.

Plaintiffs' proposed use of experts would not assist the inquiry on remand. It would, however, require additional time for Defendants to evaluate any expert reports and consider whether response experts are needed, which could trigger response and reply expert reports. Depositions of all experts, by all parties, would follow. This would cause unnecessary expense and delay in the case. Given the current posture and authorities to the contrary, there is no basis to allow expert testimony as Plaintiffs propose.

### D. Defendants' Proposed Timeline

This litigation remains largely on track with the timeline Defendants proposed in May, recognizing that additional discovery will be needed. (*See* Dkt. 433:13 (second proposed schedule).) After the discovery conducted so far, it appears more important than ever that the

parties have time to engage in a good faith effort to stipulate to all material facts that would be necessary to resolve this case by cross-motions for summary judgment. As this case develops, it is increasingly apparent that the relevant facts—which involve how a person gets an ID—are likely to be undisputed. The only issue will be the legal conclusions to draw from those facts. Defendants submit that their proposed timeline should continue to guide further discovery and proceedings.

Specifically, this case should proceed as follows:

- Plaintiffs and Defendants serve additional written discovery requests, as either stipulated by the parties or approved by the Court, on or before August 6, 2021.

- Written discovery closes on November 2, 2021.

- Following completion of discovery: November 3, 2021–January 3, 2022: the parties engage in a good faith effort to stipulate to all material facts in this case that are necessary for resolution by cross-motions for summary judgment.

- Status conference: January 10, 2022.

- Cross-motions for summary judgment: February 7, 2022.

- Responses: March 7, 2022.

- Replies: March 21, 2022.

However, if this Court were to allow either category of additional discovery that Plaintiffs have proposed (public outreach or experts), additional time will be necessary. That would involve discovery of an entirely separate agency, WEC, which would require more time. Defendants would also need time to review expert reports and potentially retain their own experts. Defendants would need, at a minimum:

- After Plaintiffs disclose expert(s), 45 days to designate experts;

- 45 days for Defendants' expert(s) to prepare responsive reports; and

- After any rebuttal by Plaintiffs' expert(s), 30 days for Defendants' expert(s) to review in preparation for expert deposition(s).

**E. Conclusion**

Given the narrow remaining legal issue, Defendants maintain that this case can be resolved based on existing DMV documents, on which the parties should be able to reach full stipulations. The issue on remand does not contemplate evidence about public-outreach, nor does it require statistical analysis about the alleged impacts on various groups of people in Wisconsin. The inquiry at issue is a personal right, and the documents show that every person who has sought an ID for voting through the IDPP has obtained a voting-qualified ID with reasonable effort. This case can therefore be finally resolved with minimal additional discovery, as outlined herein.

Dated this 23rd day of July, 2021.

Respectfully submitted,

Charles G. Curtis, Jr.
Perkins Coie LLP
33 East Main Street, Suite 201
Madison, WI 53703
Telephone: (608) 663-5411
Facsimile: (608) 663-7499
CCurtis@perkinscoie.com

Bobbie J. Wilson
Perkins Coie LLP
505 Howard Street, Suite 1000
San Francisco, CA 94111-4131
Telephone: (415) 344-7000
Facsimile: (415) 344-7050
BWilson@perkinscoie.com

 /s/ Bruce V. Spiva
Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Amanda R. Callais
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com

*Attorneys for One Wisconsin Plaintiffs*

/s/ *Karyn L. Rotker*
Karyn L. Rotker
ACLU of Wisconsin Foundation, Inc.
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Phone: (414)-272-4032 x12
Fax: (414)-272-0182
krotker@aclu-wi.org

Dale E. Ho
T. Alora Thomas
Davin M. Rosborough
Samantha Osaki
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212)-549-2648
dho@aclu.org
athomas@alcu.org
drosborough@aclu.org
sosaki@aclu.org

Neil A. Steiner
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212)-698-3500
Fax: (212)-698-3599
neil.steiner@dechert.com

Angela M. Liu
Dechert LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
Phone: (312)-646-5800
Fax: (312)-646-5858
angela.liu@dechert.com

Selby Brown
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215)-994-4000
Fax: (215)-994-2222
selby.brown@dechert.com

Tristia Bauman
National Law Center for Homelessness &
Poverty
2000 M Street NW, Suite 210
Washington, D.C. 20036
Phone : (202)-638-2535

Anna Q. Do
Dechert LLP
US Bank Tower
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Phone: (213)-808-5760
Fax: (213)-808-5760
anna.do@dechert.com

Tharuni A. Jayaraman
Dechert LLP
1900 K Street NW
Washington, D.C. 20006
Phone: (202)-261-3330
Fax: (202)-261-3333
tharuni.jayaraman@dechert.com

*Attorneys for Luft Plaintiffs*

ERIC J. WILSON
Deputy Attorney General of Wisconsin

Electronically signed by:

*/s/ S. Michael Murphy*
S. MICHAEL MURPHY
Assistant Attorney General
State Bar #1078149

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

*Attorneys for Defendants*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-5457 (Murphy)
(608) 267-8904 (Johnson-Karp)
(608) 266-3094 (Schmelzer)
(608) 267-2223 (Fax)